JOSEPHINE GARDNER, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

1. Under an indictment for homicide, where the State seeks to introduce a dying declaration of the deceased in evidence, it should be first shown to the satisfaction of the court that at the time the declarations were made the deceased not only considered himself in imminent danger, but that he evidently believed he was without hope of recovery. The circumstances under which the statements were made must be shown, in order that the court may determine whether the statements are admissible as dying declarations.

2. The utmost care and caution should be exercised by the court in the admission of dying declarations, since such declarations are necessarily a species of hearsay evidence and their admission in evidence is an exception to the general rule of evidence which requires that the witness shall be sworn and the defendant given privilege of cross-examination.

3. Whether a sufficient and proper predicate has been laid for the admission in evidence of dying declarations is a preliminary matter for determination by the trial court, being a mixed question of law and fact, and the judgment of such court thereon is entitled to great weight, every presumption being in favor of its correctness, but such ruling is subject to re view by an appellate court, though it will not be disturbed, unless it clearly appear to be erroneous. If the appellate court is clearly convinced that the trial court committed error in admitting such dying declarations, it is its duty to pass upon such ruling, when the same is properly assigned as error, and to reverse the judgment if necessary for the furtherance of justice.

4. Dying declarations are substitutes for sworn testimony and must yield to the general rules governing the admissibility of evidence, and nothing can be admitted as evidence in such a declaration to which the declarant would not be permitted to testify on the witness-stand, had he survived.

5. It is error to admit in evidence a copy of a dying declaration taken down by a Justice of the Peace, over the objection of the defendant, when the absence of the original has not been

satisfactorily accounted for and explained, especially where the original would not be admissible.

6. It is error to deny a motion to strike out certain portions of a dying declaration that give the opinion of the deceased as to the intentions of the defendant, when such motion is properly restricted to such objectionable portions of the declaration.

This case was decided by Division A.

Writ of Error to. the Circuit Court for Walton County.

The facts in the case are stated in the opinion of the court.

*Daniel Campbell & Son,* for plaintiff in error;

*W. H. Ellis,* Attorney General, for the state.

SHACKLEFORD, C. J.—Josephine Gardner, the plaintiff in error, was indicted for manslaughter, tried and convicted at the Fall term, 1907, of the circuit court for Walton county and sentenced to a term of imprisonment in the state prison for six years. From this judgment and sentence she seeks relief here by writ of error.

The first assignment is as follows: "The court erred in permitting the state attorney to offer and read in evidence what purported to be a copy of the dying declarations made by the deceased, over defendant's objection."

Previous to the offer and introduction of the paper in question in evidence, the state had introduced evidence to the effect that the deceased and the defendant were living together as husband and wife and that the tragedy in which the deceased lost his life was enacted

at his house in Walton county late in the afternoon of Friday, the 24th day of May, 1907; that the defendant was at home talking with Tom Johnson, one of the state witnesses, when the deceased came up to the house, and an altercation ensued between him and the defendant, though what occasioned it is not disclosed by the evidence; that the deceased picked up a rake with which he threatered and also thrust at the defendant, who finally ran outside of the yard with the deceased in pursuit of her, though he had put down the rake; that she had a pistol in her possession at the time deceased came to the house and, while he was still pursuing her and had gotten within about five steps of her and was gaining upon her, she, without turning round, threw the pistol on deceased and discharged it at him, wounding him in the abdomen, from the effects of which wound he died early the following Sunday morning. We deem it unnecessary to further set out the details.

The state then introduced as a witness D. E. Douglass, who testified that he held the position of justice of the peace in Walton county, and was acquainted with both the defendant and the deceased, and then the following proceedings took place during his examination:

"Q. Do you know where Walter Gardner is now? A. Yes sir, I suppose he is dead, I didn't see him after he died, I saw him before he died. Q. Did you see him after he was shot? A. Yes sir, the next morning after they said he was shot, the evening before. Q. That is the last time you saw him? A. Yes sir. Q. State whether or not that was after he was shot on Friday? A. Yes sir. Q. At that time did he make any statement to you about being shot? A. Yes sir, he made a statement. Q. Now at the time he made that statement to you, did he state anything to you about what his condition was, whether he was going to get well or die? A. He said he wasn't. Q. He said he wasn't going to

get well? A. Yes sir, he said he wasn't going to live. Q. Did he express any hope of recovery? A. No sir, he said he knew he couldn't stand it long. Q. Then did he make any statement to you about the shooting? A. Yes sir, I asked him some questions about who shot him and all about it. Q. Did you write down the questions you asked him? A. Yes sir. Q. Did you write down the answers he made you? A. Yes sir. Q. What did you write that down in? A. I had a little book with me I put them down in. Q. You had a little book with you and you wrote the questions down in that? A. Yes sir. Q. Now look at this paper (counsel hands paper to witness). A. Yes, sir. Q. You didn't have it with you at that time? A. No sir, I didn't. I had a little book and lead pencil. Q. Are these questions and answers an exact copy of the questions and answers you made at this time? A. Yes sir, the exact questions and answers.

Mr. Kehoe: We desire to offer this as a dying declaration of Walter Gardner.

Mr. Campbell: Is it signed by him?

Mr. Kehoe: No.

Whereupon the attorney for the defendant objected to the admission of the same in evidence because it is shown to be a copy of what he may have had in a book and it has not been sufficiently shown that this party was in a position to make a dying declaration. And the said judge did then and there deliver his opinion and decide that the same was admissible in evidence, to which ruling of the court the said defendant, by her attorneys, did then and there except.

Dying declaration read to the jury as follows:

STATE OF FLORIDA
        vs.
JOSEPHINE GARDNER.

Testimony of Walter Gardner taken 25th day of May, A. D. 1907. Q. What was the quarrel about? A. Nothing much, she was mad with me. Q. Did she shoot you on purpose? A. She did. Q. Was it accidental? A. No sir, she shot me a purpose, and I want her punished for it. Q. Whose pistol was it? A. Mine, but I didn't think she would shoot me with it. Q. Was you trying to hit her with the rake? A. I did have it, but had it down before she shot me. Q. How far was she when she shot you? A. About as far as to the side of the wall (about five feet). Q. Do you think you will over it? A. No, I can't live, but I want her punished for she tried to kill me.

STATE OF FLORIDA,
COUNTY OF WALTON.

I, D. E. Douglass, a justice of the peace in and for the county of Walton, do hereby certify that the above is a true statement made to me by the deceased Walter Gardner on the above date. This 31st day of May, A. D., 1907.

(L. S.) D. E. Douglass, justice of the peace sixth justice district, Walton county, Florida.

Mr. Kehoe: Q. Mr. Douglass, where was Walter Gardner at the time he made the statement to you? A. There at his own house. Q. The day after he had been shot the evening before? A. Yes sir. Q. Did you propound these several questions to him? A. Yes sir. Q. These answers I have read, did he make these very answers? A. Yes sir. Q. You wrote down the questions and answers and these are the questions and an-

swers as made then? A. Yes sir. Q. Do you know anything more about this case? A. No, sir.

### Cross Examination.

Q. Who was with you? A. I don't know that there was anybody with me, Jim Blackwell, Quarterman McCaskill, Dan Jackson, Steven McCaskill—I don't remember, a pretty good crowd was there—Josephine herself was there, I think. Q. What was your purpose in going there? A. To take his testimony. Q. What time of day was it? A. As near as I can recollect it was between eight and nine o'clock in the morning. Q. When was it he told you he could not stand it long, he could not get over it? A. He told me himself, I asked him. Q. When was it, I say? A. When I was taking down the testimony. Q. When you were taking down the testimony? A. Yes sir. Q. Before or after? A. Before I took it down—while I was taking it. Q. And he didn't express any hope of getting well? A. No sir. Q. Didn't he say he hoped he would get well? A. I don't think he did. Q. This was on Saturday morning? A. Yes sir.

### Re-Direct Examination.

Q. Did you see Josephine out there when he made this statement? A. Yes sir, around and about I seen her, but we made her go out of the room while he made this statement. Q. You made her go out of the room while he made this statement? A. Yes sir.

### Re-Cross Examination.

Q. She was at the house? A. Yes sir, but not in the room when I was taking the testimony. Q. But she was there when you got there? A. Yes sir. Q. She was in the house when you went there? A. I would not be positive—I seen her in the room at dif-

ferent times, I don't recollect whether she was in the room when I got there. Q. You say you did have her to go out of the room when you were taking the testimony? A. Yes sir, I had somebody else to tell her.

The state having rested its case, the defendant, by her attorneys, moved the court to strike so much of the statement as is given as the opinion of the man as to the intentions of the defendant.

The court did then and there deliver his opinion and decide that it should go in altogether, that that part which was sought to be stricken was perhaps a matter for argument or special instruction, and the motion was denied. To which ruling of the court the defendant did then and there except."

We are thus brought also to the consideration of the second assignment, which is that "the court erred in refusing to strike that portion of the copy of the dying declarations that gave the opinion of the deceased as to the intentions of the defendant."

We are of the opinion that each of these errors is well assigned. We have a line of decisions in this state relating to the admissibility of dying declarations. See Dixon v. State, 13 Fla. 636; Savage and James v. State, 18 Fla. 909; Roten and Thompson v. State, 31 Fla. 514, 12 South. Rep. 910; Lester v. State, 37 Fla. 382, 20 South Rep. 232; Morrison v. State, 42 Fla. 149, 28 South. Rep. 97; Richard v. State, 42 Fla. 528, 29 South. Rep. 413; Clemmons v. State, 43 Fla. 200, 30 South. Rep. 699; Green v. State, 43 Fla. 552, 30 South. Rep. 798; Newton v. State, 51 Fla. 82, 41 South. Rep. 19. A reference to these decisions discloses the fact that the following rule or principle first enunciated in Dixon v. State, *supra,* has been consistently adhered to:

"Under an indictment for homicide, where the prosecutor seeks to introduce a dying declaration of the deceased in evidence, it should be first shown to the satis-

faction of the court that at the time the declarations
were made the deceased not only evidently considered
himself in imminent danger, but that he evidently be-
lieved he was without hope of recovery. The circum-
stances under which the statements were made must be
shown, in order that the court may determine whether
the statements should be given to the jury as dying
declarations." As was also said in this well considered
case: "They are only admissible where the party mak-
ing them knows or thinks that he is in a dying state.
Positive evidence of this knowledge is not required, but
it may be inferred from the general conduct and deport-
ment of the party; and it is not necessary to prove
*expressions* of apprehension of immediate danger,
if it be clear that the party *does not expect
to survive* the injury." As was said in Lester v. State,
*supra*: "The law regards the declarant, when in the
presence of imminent and inevitable death, as being
under as solemn an inspiration to tell the truth as though
he were pledged thereto by oath. To render such decla-
rations admissible however, the court must be satisfied
that the deceased declarant, at the time of their utterance,
knew that his death was imminent and inevitable, and
that he entertained no hope whatever of recovery. This
absence of all hope of recovery, and appreciation by the
declarant of his speedy and inevitable death, is a pre-
liminary foundation that must always be laid to make
such declarations admissible. It is a mixed question of
law and fact for the court to decide before permitting
the introduction of the declarations themselves. The
judge hears all pertinent evidence that exhibits the state
of mind of the deceased at the time of making his asser-
tions, as to whether he appreciated his near and inevit-
able approach to death, and as to whether he was with-
out hope of recovery, and is satisfied by such evidence
that the declaration was made under such circumstances

as makes it legally admissible, it should be admitted."
Also see Green v. State, *supra,* to the same effect.

Since such declarations are necessarily a species of
hearsay evidence and their admission in evidence is an
exception to the rule concerning hearsay evidence as
well as an exception to the general rule of evidence which
requires that the witness shall be sworn and the defend-
ant given the privilege of cross-examination, the utmost
care and caution should be exercised by the court in the
admission of dying declarations.   See 6 Ency. of Ev.
915, 945, and authorities cited in notes; Justice v. State,
99 Ala. 180, 13 South. Rep. 658; State v. Daniels, 115
La. 59, 38 South. Rep. 894; 21 Cyc. 992.

Tested by the requirements laid down in the cited
authorities, was a sufficient and proper predicate laid
for the admission in evidence of the dying declarations
in the instant case?   To say the least of it, it appears to
us to be exceedingly doubtful.   We recognize the fact
that this is a preliminary matter for determination by
the trial court and that the judgment of such court
thereon is entitled to great weight, every presumption
being in favor of its correctness.   Still, as this court has
said, it is a mixed question of law and fact for the trial
court to decide, and, this being true, it follows that the
ruling of such court thereon is subject to review by an
appellate court, though such ruling will not be disturbed,
unless it clearly appears to be erroneous.   See 6 Ency.
of Ev. 979 and authorities there cited.   If the appellate
court is clearly convinced that the trial court committed
error in admitting such dying declaration, it is its duty
to pass upon such ruling, when the same is properly as-
signed as error, and to reverse the judgment if neces-
sary for the furtherance of justice.   See Dixon v. State,
*supra,* and Green v. State, *supra.*

Even if we could pass the question as to whether or
not a sufficient and proper predicate was laid for the

3—55 Fla.

admission of any dying declaration, we would then en-
counter the question as to whether or not the so-called
dying declaration in the instant case was admissible.
As was said in the case of Green v. State, *supra,* "It was
not signed by the deceased nor is it shown that it was
read to and assented to by him as being correct." Also
see Richard v. State, *supra,* and 21 Cyc. 979 and author-
ities cited in notes.    It is further true that dying dec-
larations are substitutes for sworn testimony and must
yield to the general rules governing the admissibility of
evidence, and that nothing can be admitted as evidence in
such a declaration to which the declarant would not be
permitted to testify on the witness stand had he survived.
See 21 Cyc, 987, and authorities cited in notes; 6 Ency.
of Ev. 991; Savage and James v. State, *supra;* Richard
v. State, *supra;* Clemmons v. State, *supra.* We also call
attention to the fact that the original declaration or
statement of the deceased taken down by the justice of
the peace was not introduced in evidence, nor was its
absence satisfactorily accounted for, but a copy thereof
was offered and admitted, over the objections of the
defendant.    This was clearly erroneous, being violative
of the established rule.    See Turner v. State, 89 Tenn.
547, 15 S. W. Rep. 838.    Under the cited authorities,
it was also erroneous to refuse to grant the motion of
the defendant to strike out that portion of the dying
declaration that gave the opinion of the deceased as to
the intentions of the defendant.    The motion was prop-
erly restricted to the objectionable portions of the decla-
ration and should have been granted.    See Savage and
James v. State, *supra;* Richard v. State, *supra;* 21 Cyc.
988; 6 Ency. of Ev. 993, 994.

At the time of denying the motion the court stated
that the "part which was sought to be stricken was
perhaps a matter for argument or special instruction, and

later on in charging the jury, at the request of the state, gave the following instruction:

"The court charges you that no part of the declaration read to you that simply express the opinion of the deceased as to why his wife shot him, or any other opinion expressed by him in such declaration is such evidence as you should consider. The only parts you are to consider are those parts in which he actually testifies to the facts, or to the actual things which occurred on the occasion of the shooting."

It would have been the better practice to have granted the motion when made. In the instant case the evidence adduced against the defendant was not so strong and convincing as to preclude harm resulting to the defendant by reason of this expression of deceased as to the intentions of the defendant being permitted to go to the jury to be dwelt on by them during the trial. Such expressions are sometimes difficult to be removed from the mind and are not always readily effaced or erased by the judge's charge or instruction. However, as we have held that the entire declaration was improperly admitted, further discussion of this point is unnecessary.

Other assignments are based upon the giving of certain portions of the general charge and of certain instructions at the request of the state. We do not deem it necessary to discuss them, as the judgment will have to be reversed for the errors already found. At another trial we would suggest that the instructions be confined to the law applicable to the testimony.

Judgment reversed.

COCKRELL and WHITFIELD, JJ., concur;

TAYLOR, HOCKER, and PARKHILL, JJ., concur in the opinion.