SILAS CHISOLM, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

Opinion Filed July 2, 1917.

1. An application for a change of venue is addressed to the sound judicial discretion of the trial court, and the refusal of such application will not be held to constitute reversible

error by the appellate court, unless it is plainly made to appear from the transcript of the record that the trial court acted unfairly and abused such discretion.

2. In passing upon an assignment in a criminal case based upon the refusal of an application for a change of venue upon the ground that a fair and impartial trial could not be had in the county where the crime was committed by reason of the fact that the inhabitants of such county were so prejudiced against the defendant as to render it impracticable to get a qualified jury to try the case against the defendant, an appellate court may examine the entire transcript of the record and where it appears therefrom that out of a special venire of 25 men, summoned from the body of the county, a jury was selected and accepted by the defendant, without exhausting the challenges allowed by the law, so far as is shown, the appellate court may be strenghtened in its conclusion that no abuse of judicial discretion by the trial court has been made to appear.

3. One of the essential ingredients of murder in the first degree is that it must have been "perpetrated from a premeditated design to effect the death of the person killed or any human being," and, in a prosecution for such crime, where there are no facts and circumstances in evidence from which the formation of the alleged premeditated design may be found, a verdict of murder in the first degree should be set aside and a new trial granted upon proper proceedings duly taken.

Writ of Error to Circuit Court for Citrus County, W. S. Bullock, Judge.

Judgment reversed.

*Bullock & Trantham,* for Plaintiff in Error;

*T. F. West,* Attorney General, and *C. O. Andrews,* Assistant, for the State.

SHACKLEFORD, J.—Silas Chisolm seeks relief here from a conviction of the crime of murder in the first degree. We shall first consider the seventh assignment, which is based upon the denial of the defendant's motion for a change of venue. The statute regulating a change of venue, under which this motion was made, is Section 3997 of the General Statutes of 1906, Compiled Laws of 1914, and reads as follows: "Whenever it shall be made to appear to the satisfaction of the presiding judge of any of the circuit courts of this State that the venue of any cause, then pending in such court, should be changed either because a fair and impartial trial cannot be had in the county where the crime was committed, or because it is impracticable to get a qualified jury to try the case in the county where the crime was committed, or where it appears from the examination of the books of registration of the county, that there are not a sufficient number of registered voters to form a grand or petit jury, it shall be in the power and discretion of such judge to change the venue of such case, from the circuit court of the county where such cause is at the time pending to the circuit court of any other county within the same circuit." This section is a consolidation and amendment of several statutes. See Sections 2927, 2028 and 2930 of the Revised Statutes of 1892 and Chapter 4394 of the Laws of Florida, (Acts of 1895, p. 159), to which we have had occasion to refer and discuss several times. We have repeatedly and uniformly held that "Applications for changes of venue are addressed to the sound discretion of the trial court, and the refusal of such applications will not be held erroneous, unless it appears from the facts presented that the court acted unfairly and committed a palpable abuse of sound discretion." See McNealy v. State, 17 Fla. 198; Irvin v. State, 19 Fla.

872; Adams v. State, 28 Fla. 511, 10 South. Rep. 106; Leslie v. State, 35 Fla. 171, 17 South. Rep. 555; Shepherd v. State, 36 Fla. 374, 18 South. Rep. 773; Shiver v. State, 41 Fla. 630, 27 South. Rep. 36; Roberson v. State, 42 Fla. 223, 28 South. Rep. 424; Squires v. State, 42 Fla. 251, 27 South. Rep. 864; Hewitt v. State, 43 Fla. 194, 30 South. Rep. 795; O'Berry v. State, 47 Fla. 75, 36 South. Rep. 440; Collins v. State, 64 Fla. 239, 60 South. Rep. 785; Robertson v. State, 64 Fla. 437, 60 South. Rep. 118; Roberts v. State, 72 Fla. 132, 72 South. Rep. 649, In the instant case the application for a change of venue was supported by the affidavits of the defendant himself, Hon. R. B. Bullock, one of his attorneys, and Mr. John P. Galloway, the sheriff of Marion county. No useful purpose would be served by setting forth the substance of these affidavits. It is sufficient to say that we have carefully read them, as well as the entire transcript of the record, including the opinion rendered by the Circuit Judge upon such application, which is copied in the transcript. We are of the opinion that the affidavits submitted do not show that the inhabitants of Citrus county were so prejudiced against the defendant as to render it improbable that a fair and impartial trial could be had in such county. We are strengthened in this conclusion by the fact that the transcript of the record shows that out of a special venire of 25 men, summoned from the body of the county, a jury was selected and accepted by the defendant, without exhausting the challenges allowed him by the law, so far as is made to appear. We fail to find any abuse of discretion by the Circuit Judge in overruling the application for a change of venue, therefore must hold that this assignment has not been sustained.

The other assignments which are insisted upon before

us are based upon the refusal of certain requested instructions and the overruling of the motion for a new trial. No exceptions were taken to any portion of the charge given by the court of its own motion, so we must assume that the defendant had no fault to find with it. In fact, one of the grounds of the motion for a new trial which is strenuously argued is that the verdict returned was contrary to the charge of the court, certain portions of which are copied and emphasized by the defendant in his brief. We have carefully examined the requested and refused instructions which are complained of and are of the opinion that such assignments have not been sustained. The requested and refused instructions would seem to have been fully covered by the charge of the court in so far as the principles of law stated in such instructions are correct and applicable, so we must hold that these assignments have failed.

The other grounds of the motion for a new trial are that the verdict is contrary to the law and is not supported by the evidence. After a careful scrutiny of all the evidence adduced we are constrained to hold that it is insufficient to uphold a verdict of murder in the first degree and the imposition of the sentence of death upon the defendant. Section 3205 of the General Statutes of 1906, Compiled Laws of 1914, defines the three degrees of murder and prescribes the punishment therefor as follows: "The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery or burglary, shall be murder in the first degree, and shall be punishable with death. When perpetrated by any act imminently dangerous to another, and evincing a depraved mind regard-

less of human life, although without any premeditated design to effect the death of any particular individual, it shall be murder in the second degree, and shall be punished by imprisonment in the State prison for life.

"When perpetrated without any design to effect death, by a person engaged in the commission of any felony, other than arson, rape, robbery or burglary, it shall be murder in the third degree, and shall be punished by imprisonment in the State prison not exceeding twenty years." We have often had occasion to refer to and construe this statute, so that there is no occasion for any extended discussion. As we have repeatedly held, one of the essential ingredients of murder in the first degree is that it must have been "perpetrated from a premeditated design to effect the death of the person killed or any human being." See Baker v. State, 54 Fla. 12, 44 South. Rep. 719, wherein we held: "In a prosecution for murder in the first degree charged to have been committed from a premeditated design to effect death, and there are no facts and circumstances in evidence from which the formation of the alleged premeditated design may be found, a verdict of murder in the first degree should be set aside and a new trial granted upon proper proceedings duly taken." Also see Savage v. State, 18 Fla. 909; Ernest v. State, 20 Fla. 383; Denham v. State, 22 Fla. 664; Barnhill v. State, 56 Fla. 16, 48 South. Rep. 251. As we held in Whidden v. State, 64 Fla. 165, 59 South. Rep. 561, "A sudden transport of passion, caused by adequate provocation, if it suspends the exercise of judgment, and dominates volition, so as to exclude premeditation and a previously formed design, may not excuse or justify a homicide, but it may be sufficient to reduce a homicide below murder in the first degree, although the passion does not entirely dethrone the actor's reason." Like-

wise we held in Disney v. State, 72 Fla. 492, 73 South. Rep. 598, "A killing in the 'heat of passion' occurs when the state of mind of the slayer is necessarily different from that when the killing is done in self-defense. Whether he believes or does not believe that he is in danger is immaterial. He is intoxicated by his passion, is impelled by a blind unreasoning fury to redress his real or imagined injury, and while in that condition of frenzy and distraction fires the fatal shot. In that condition of mind, premeditation is supposed to be impossible, and depravity which characterizes murder in the second degree absent."

As the judgment will have to be reversed and the case remanded for a new trial, we refrain from any extended analysis or discussion of the evidence. Suffice it to say that the undisputed evidence establishes that the defendant was engaged with other men, who were working under him, in cutting and getting out cedar for a mill company and while so engaged, as is testified to by Dan Thomas, a State witness, on his direct examination, after five o'clock on the afternoon of the tragedy the defendant had shot a squirrel, when the deceased came up and the following proceedings took place: "Mr. Briggs asked who was doing that shooting, and Chisolm said, 'It was me.' He says, 'Well, I told you that I didn't want no shooting over here on this island,' and he says, 'I mean what I say about it.' Well, Chisolm didn't say anything, and he said, 'I don't want you all to be caught on this island no more;' and I spoke and said, 'No, sir,' was every word I said. Well, he come on and didn't say no more, and Chisolm didn't say nothing. When we got to where Chisolm's ox lot was Mr. Briggs walked on by. Q. Going down towards the river? A. Yes, sir. Q. Down towards his place? A. Sir? Q. He was coming on towards where

he lived? A. Well, sir, he was coming on down to the landing, where the wood was piled up. He lived on up the river from where the wood was; and he turned around and he said 'Where is that wood that you had piled up here?' and Chisolm said 'Which wood?' He said 'That wood that General Robinson hauled up here and put some fans between it and the other wood? Q. Up on the bank? A. Yes, sir; and Chisolm said, 'it is in the river.' He said 'It is in the water.' He said, 'Well, I don't want you to move a piece of that wood.' Chisolm said, 'You will have to see Mr. Thompson about that,' and he said, 'Well, I will give you orders not to move a piece of that wood.' Chisolm said, 'Well, you will have to see Mr. Thompson,' and he said, 'Well, I will see Mr. Thompson, and don't you move a piece of that wood from there.' At that time Chisolm spoke and he said, 'Mr. Briggs, you put me over here to cut this wood, and,' he said, 'now I don't think it is right for you to come over here interfering with my men.' Mr. Briggs turned around, and he said—he says, 'Who are you talking to?' and then he made back to Chisolm and he struck Chisolm, and Chisolm hit him, and that was every word that was passed. Q. How far were you away from this? A. Well, I was something, I reckon, as near as I can come at it, about 12 or 15 steps, something like that; I don't know just how far, but I am satisfied I was that far from them. THE COURT: Show us some place in the court room what you suppose is 12 or 15 steps? A. Well it might have been something like from here to them posts over there. THE COURT: Those posts supporting that gallery? A Yes, sir, it might have been something like that. Mr. Scofield: Did Chisolm knock Mr. Briggs down when he hit him? A. Yes, sir. Q. How did he fall? A. He fell on his back and whirled over on his stomach and got up,

and he caught himself like that (indicating), and he
said 'Oh, me.' Q. Caught his stomach and said, 'Oh me?'
A. Yes, and walked right on down to the river, and when
he got there I don't know whether he got in his boat—
there were trees, palmettos and fans betwixt us and the
river, I couldn't see whether he was in his boat or not
when he called Mr. Thompson, and I did not hear Mr.
Thompson answer; but some few minutes after that I
heard Mr. Thompson say, 'where is he.' Q. He called Mr.
Thompson when he got down to the boat? A. Yes, but
I don't know whether he was in the boat when he called
Mr. Thompson, but he was there close to the river if not
in his boat. Q. Did he fall square on his back? A. He
fell right flat on his back. Q. Where did Chisolm hit
him at? A. He struck him right up there, (indicating
head) somewhere, over left eye. Q. Do you know what
he hit him with? A. With his fist, was all I seen.
Q. You couldn't tell? Mr. Bullock: He said with his fist.
The Witness: I never seen a thing but that. Mr. Sco-
field: You don't undertake to say what he hit him with,
do you? A. Well, I couldn't say that he had anything
but his fist, for I didn't see nothing but his first. Q. I
say you don't undertake to say that he did not have noth-
ing but his fist. A. Well, sir, No, I couldn't say that he
did or I couldn't say that he did not, but I saw nothing
else. Q. You just don't know? A. All I seen was his
fist. Q. I say, you just don't know? A. No, I don't
know that he didn't have nothing else, but I didn't see
nothing else."

On his cross-examination, the witness testified as fol-
lows: Q. "How long had you been over there cutting cedar?
A. Two or three weeks. Q. The cedar company buys the
cedar and hires Chisolm to cut it? A. Yes. Q. Who is
this Mr. Thompson you referred to? A. He is the cedar

mill boss, a sort of superintendent, tells the foreman where to cut cedar and so on. Q. Chisolm was cutting cedar for the mill, was he? A. Yes, sir. Q. And you were hired by Chisolm? A. Yes, sir, me and Irving Summers. Q. 'Were you and Irving Summers the only persons there that evening at the time of the difficulty? A. Yes, we were the only ones. Q. And Mr. Briggs said to you all that he did not want to catch you over there on that island any more? A. Yes, sir. Q. And you said, 'Yes, sir?' A. I told him 'No sir.' Q. And then Chisolm said to him that he had put him over there to cut the cedar he did not think it was right for him to interfere with his hands? A. Yes, sir. Q. Did Chisolm use any curse words? A. No sir. Q. Did he say that in a respectful manner? A. Yes, he spoke and said, 'Mr. Briggs, you put me over here to cut this cedar and I don't think it is right for you to come over here now interfering with my men.' Q. And then Briggs said what? A. Asked him who he was talking to. Q. Did he say that in an angry tone? A. No, sir, just said 'who is you talking to.' Q. And then turned around and—? A. Yes, sir. Q. (continued) made back to Chisolm? A. Yes, sir. Q. Now, when he turned how far was he from Chisolm? A. Well, he might have been something like from here to them banisters there, or might have been— Q. These (indicating the banisters in court room) you mean. A (continued), or he might have been a little further. Q. Did Briggs come back in a hurried manner and strike Chisolm. A. Yes, he came walking back pretty fast. Q. Was he walking pretty rapid and did he show some anger? A. Yes. Q. He rushed up to him and struck him? A. Yes, and Chisolm then struck him. Q. Was it just blow for blow like that (indicating with arms)? A. Yes, he struck Chisolm and Chisolm struck him. Q. Chisolm struck him with

his fist? A. That was all that I seen was his fist. Q. Now listen at me, you had been with Chisolm previous to that—before that? A. Yes, sir. Q. Walking right along with him, wasn't you? A. Yes, sir. Q. Were his hands open when he was walking there? A. He didn't have a thing in his hands but his shot gun while we were coming. Q. Did he have his shot gun in his hands when he struck Mr. Briggs? A. No sir, it was setting down by the side of a tree. Q. What did Chisolm start to do before he was struck? A. He started to feed his oxen. Q. He had an ox pen over there? A. Yes, sir, for the oxen he hauled cedar with. Q. Now, when Briggs rushed on Chisolm, did Chisolm have anything in his hands or stand with his hands open? A. He had walked to his cotton hull seed sack and had stooped over like that (indicating) to get some hulls—he would always when he was over on the island, go to the lot and had some feed down there before they got there. Q. When Briggs struck him, were his hands by his sides — Chisolm's hands, A. Yes, sir, Chisolm never had his hands in his pockets at all. Q. Now you don't know, that when he struck Briggs, if he had had anything in his hands that you would have been bound to see it? A. Well, I say, if he had had anything in his hands it looks like I could have seen it. Q. So these blows were just like that (indicating with hands)? Were they? A. Yes, sir. Q. He hit Chisolm and Chisolm hit him? A. Yes, sir, there wasn't but two licks passed. Q. Did Mr. Briggs curse Chisolm at all? A. Neither of them made an oath. Q. When Mr. Briggs walked off and went to his boat did he apparently walk all right? A. Yes, sir, he went off to his boat holding his stomach like that (indicating). Q. What kind of a boat did he have, and did he have to crank it to get in it? A. A gasoline boat that had to be cranked to get to

run? Q. Did he run the boat up to his home? A. I couldn't see after he got out in the river. I heard the boat going off. He had to go around the bend and I couldn't see him. Q. How far is that cedar landing from the mill? A. I don't know sir, it is across the river, might be 300 yards, I ain't no judge of water."

We shall not copy the testimony given by the witness on his re-direct examination, as it throws no additional light on the tragedy. Thomas was the only eye-witness to the homicide introduced by the State. His testimony was largely corroborated by the defendant, who testified in his own behalf. It was established that the deceased died from the effects of this blow inflicted by the defendant. The State introduced physicians by whom it attempted to prove from the character of the wound on the head of the deceased that it could not have been caused by a blow from the fist, but must have been inflicted by some instrument, but, as we read the testimony, the physicians did not testify that such wound could not have been inflicted by the fist, but that they did not consider it probable. We see no occasion to set out or comment upon their testimony. As we have already said, we are of the opinion that the evidence failed to establish a premeditated design upon the part of the defendant to effect the death of the deceased, and therefore was insufficient to sustain the verdict of murder in the first degree.

The judgment is reversed.

BROWNE, C. J., AND TAYLOR AND ELLIS, J. J., concur.

WHITFIELD, J., absent on account of sickness.