FLOYD FOLKS, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed February 26, 1923.

1. In a prosecution for homicide where no abuse of discretion or unfairness to the defendant is shown, the court will not be held in error for denying a motion for change of venue on the ground of prejudice against the defendant and the influence of the family of the deceased throughout the county, when "an impartial jury" as required by the constitution was readily selected after the denial of the motion for a change of venue.

2. Whether a sufficient and proper predicate has been laid for the admission in evidence of dying declarations is a primary matter for determination by the trial court, being a mixed question of law and fact, and the judgment of such court

thereon is entitled to great weight, every presumption being in favor of its correctness, but such ruling is subject to review by an appellate court, though it will not be disturbed, unless it clearly appears to be erroneous.

3. Even if technical error may have been committed in admitting proffered testimony of a purported dying declaration, if other evidence properly adduced establishes the fact sought to be proven by the dying declaration and no harm could reasonably have resulted to the defendant, such technical error, if any, will not justify a reversal of the judgment.

4. While it is encumbent upon the State to prove every element of an offense, the proof may be by evidence of circumstances that are sufficient to support inferences of guilt of the offense found by the verdict.

5. An intent to kill is not an essential element of manslaughter and intoxication does not excuse such offense.

6. Manslaughter is not a degree of murder, but it is a grade or degree of unlawful homicide.

7. Voluntary intoxication, even though the immediate effect of it is to render the person unconscious for the time of what he is doing or to render such person temporarily insane, as distinguished from a fixed or settled frenzy or insanity either permanent or intermittent, does not excuse a homicide or any act, which, in the absence of such unconsciousness or temporary insanity, would be criminal. This is the general rule applicable wherever the voluntary doing of the wrongful act constitutes the crime or a particular or specific intent is not an essential or constituent element of the offense; and in all such cases a person who is at the time of the commission of the act unconscious or insane as the immediate consequence of voluntary intoxication is liable in the same manner and to the same degree that he would be if sober.

8. There is ample evidence to sustain the verdict.

A Writ of Error to the Circuit Court for Levy County; A. V. Long, Judge.

Judgment affirmed.

*Robert W. Davis* and *J. Asakiah Williams,* for Plaintiff in Error.

*Rivers Buford,* Attorney General, and *Marvin C. McIntosh,* Assistant, for the State.

WHITFIELD, J.—Upon an indictment charging murder in the first degree by shooting Lonnie Studstill in Levy County, Florida, Floyd Folks was convicted of manslaughter and took writ of error to a judgment imposing a seven years sentence.

A motion was made for a change of venue upon the ground that it is not practicable to obtain in the county a fair and impartial jury for the trial of the case, because the prejudice against the defendant is so widespread and acute and because the deceased "belonged to a family, the members of which either by blood or marriage, is very numerous, and there is scarcely a locality in the county where some one of said family, either of affinity or consanguinity, does not reside." The motion was supported by affidavits of "opinion that it would be impractical to get an impartial jury in the said county to try the said Folks on said charge or to give to the said Folks a fair and impartial trial."

The court overruled the motion and it does not appear that there was any difficulty in securing "an impartial jury" as is required by the constitution and contemplated by the statutes under which the jurors are selected. No

abuse of discretion or unfairness to the defendant is shown by the refusal to change the venue.  Adams v. State, 28 Fla. 511, 10 South. Rep. 106.

An application for a change of venue is addressed to the sound judicial discretion of the trial court, and the refusal of such application will not be held to constitute reversible error by the appellate court, unless it is plainly made to appear from the transcript of the record that the trial court acted unfairly and abused such discretion. Chisolm v. State, 74 Fla. 50, 76 South. Rep. 329.

It appears that the decedent, the accused and his brother made a round-trip journey in an automobile and procured a quantity of moonshine, an intoxicating beverage, of which they partook pretty freely.  On the journey a pistol was borrowed by the accused and at another place cartridges for the pistol were bought by the accused.  But it does not appear that this was done with any ill will or unlawful intent towards the deceased.  Before the trio on their return reached the place from which they started, the deceased who sat on the front seat with the accused was shot in the chest and the accused who was driving the automobile was shot in the lower right side.  Another person was met on the road and induced to drive the car for a mile or more to the starting point because of the wounded driver.  Upon arrival at the initial point the deceased was taken from the car and died within an hour afterwards.

A physician testified that when he was called to the automobile ''Floyd recognized me, but Lonnie said nothing, and I saw that Lonnie was dying.  I proceeded to the other side of the car.  With the assistance of some one that came up, we helped him just inside the store door and laid him on the counter, and there we administered first aid help to him, and in that time they had gotten Floyd

through the store, back into my office, which is in the rear of the building. At that time I asked Lonnie J. Studstill where he was shot, and he says 'there' (indicating chest), just put his hand up there, and I examined him there and found there was a bullet wound in his chest. It was about one and three-quarter inches just right of the median line, below the fork of the breast bone. I did not make an examination of the wound to see the direction it went, until after he was dead and we laid him out. I saw and made an examination after he was dead. I found that the wound went right straight in. In my opinion, from what I saw of the wound, he was shot from the front. The bullet did not go through. It lodged in the body. That wound caused death. Other than that shot in the chest, he was shot between—in the three off fingers of the hand—left hand—the three off fingers. As to the nature of that wound in the hand, there was just a hole all the way through all three of those fingers, piercing through. He was not shot any place else. Q. At the time that you helped him out of the car and carried him to your office, as you testified, did he or not ask you what his condition was. A. He did after I got him inside. After he asked me, I stated to him what his condition was. My answer was that he was in a desperate condition; that his chances were ninety-nine to one against him. * * * In my opinion that wound caused his death; it was sufficent to cause death. The wound in the chest was sufficient to cause death.''

Testimony was adduced that ''Mr. Alford, before Lonnie died some three or six minutes, warned and cautioned Lonnie Studstill that he was going to die. He says to Lonnie Studstill, 'Lonnie, you are going to die, you know you are going to die; you ain't going to be but a few minutes about it; tell us who shot you; and he said 'Floyd Folks.'

Lonnie said 'Floyd Folks.' I judge he lived three to six minutes after that statement.''     *     ''He did not say whether Floyd shot him on purpose or by accident.''     *' ''He asked me several times to stay with him.''

It is contended that the admission over objection of the testimony as to what the deceased said about who shot him was reversible error because it was not properly admissible as a dying declaration.

To render dying declarations admissible, the judge must be fully satisfied that the deceased declarant, at the time of their utterance, knew that his death was imminent and inevitable, and that he entertained no hope of recovery. This absence of all hope of recovery and appreciation by the deceased of his speedy and inevitable death is a preliminary foundation that must always be laid to make such declaration admissible. It is a mixed question of law and fact for the judge to decide before permitting the introduction of the declaration itself. It is not necessary that such preliminary test should consist of express utterances, but it may be gathered from any circumstances or from all the circumstances of the case. Lowman v. State, 80 Fla. 18, 85 South. Rep. 166.

Evidence of dying declarations is admissible only in cases where the declarant has abandoned all hope of recovery from the injury received at the hands of the accused, and is convinced that his death is inevitable and near at hand. But in passing upon the question of whether the declarant was in such mental state at the time of making the declaration as to render it admissible under the foregoing test, resort may be had to all the circumstances of the case and expressed utterances are not essential.

Whether a sufficient and proper predicate had been laid for the admission in evidence of dying declarations is a

primary matter for determination by the trial court, being a mixed question of law and fact, and the judgment of such court thereon is entitled to great weight, every presumption being in favor of its correctness, but such ruling is subject to review by an appellate court, though it will not be disturbed, unless it clearly appears to be erroneous. Richardson v. State, 80 Fla. 634, 86 South. Rep. 619; Copeland v. State, 58 Fla. 26, 50 South. Rep. 621; Little v. Barlow, 37 Fla. 232, 20 South. Rep. 240; Malone v. State, 72 Fla. 28, 72 South. Rep. 415; Gardiner v. State, 55 Fla. 25, 45 South. Rep. 1028.

Even if upon the showing made by the quoted testimony and by other corroborating testimony contained in the bill of exceptions, the answer of the decedent, viz, "Floyd Folks" to the question as to who shot him was not properly admissible as a dying declaration, because it is not clearly shown that the deceased realized that he was *in extremis*, the error, if any, in admitting the quoted answer, is not reversible error in view of the testimony of the accused and of the evidence showing his conduct towards the deceased while they were under the influence of the moonshine liquor they had been drinking and of the statements made by the accused when his wound was being treated and before the deceased died.

A witness testified that "late in the afternoon, Doyle Folks and Floyd Folks and Lonnie Studstill came to my house in an automobile," and that Floyd Folks and his brother Doyle Folks went into the house of the witness and "when Mr. Studstill was out at the car he got out of the car and started to crank up the car, and so some of the folks at the house said that Mr. Studstill was cranking up the car, and the older one told the younger one, Doyle, to go and stop Lonnie from cranking up the car, and so he

told him, he says 'it is not any use,' he says, ' for me to go, Floyd, that you know I can not do anything with Lonnie; I can't stop him,' and so the older one was sitting near the door and he looked out and saw Mr. Studstill and he says,—told him—let me see—yes, he says,—told the brother to go and stop him, and he says 'it ain't no use for me to go out there, you know I can't stop him,' and so the older one looked out at him and looked back to his brother and said 'I guess I can stop him with this,' and he pulled the pistol out of his pocket, and so he done it this way (indicating with hand), and so he (Witness takes a pencil and indicates). He said 'I can stop him with this,' (indicating with pencil) and looked at his brother in the face like that, and so he,—then he stuck the pistol in his mouth that way (indicating) and he says 'Hold on, let me re-load it' and then he broke the pistol and taken out an empty cartridge and put another cartridge back in the pistol. These three men afterwards left my place in the same car. I saw them when they left. They were out at the car. The way they were situated in the car when they left, Floyd got in the car with Mr. Studstill, in the front seat, and the younger one was in the back seat. Floyd drove the car when it left there, and he and Studstill were sitting in the front seat. After Floyd Folks reloaded the pistol, he got up and showed us,—he put it back in his pocket."

One witness testified that soon after the automobile arrived with the wounded men in it, he went into the room where Floyd Folks was and that "he said 'I am shot, and says were you ever shot?' I told him no, and then he asked me how Lonnie Studstill was and I told him he was getting along very well I reckoned. He said 'I hope he will get alright; if he dies my neck will sure break.' I said 'Floyd, you ought not to talk that way; you have not

killed nobody; they don't hang people for nothing,' and he said 'I know what I am talking about though.' His mother spoke up and told him to hush talking that way. He said 'Mama, I know what I am talking about. If Lonnie Studstill dies, my neck will sure break,' and we got him quieted down and got him out.''

The defendant testified: ''On leaving Gulf Hammock for Otter Creek, Mr. Studstill took the pistol out of my pocket, examining it, and he said that this gun was not full of cartridges, and suggested that we get some more, and I told him I would. He did not give the pistol back to me then. We scuffled over the pistol; I took the gun from him when there was a chance I would take it from him, and he would catch me when I was not looking,— I was driving,—and he would take it from me, and I would catch him with his mind not on the gun, and I would take it from him. In other words we frequently snatched the gun from one another between Gulf Hammock and Otter Creek. After getting the cartridges, I loaded the gun. After that I do not remember any scuffling or taking the gun from one another after that; after we left Otter Creek. I would not be sure about whether I was drinking while I was at Mr. Crews'. My mind was so mixed up at that time I could not remember, from intoxicating drinks. My mind is not clear as to what happened. I do not remember seeing the pistol any more after I got to Mr. Crews', until after the shooting. I have no knowledge as to how the shooting took place. I have never had any quarrel or difficulty with the deceased, Mr. Lonnie Studstill. Was perfectly good friends as far as I knew. I had never at any time had any hatred or animosity in my mind towards him. I stated that I went out with him on the 9th for the purpose of investigating a tie proposition and partnership that was to be formed between Mr. Studstill and I.

We contemplated going into business together. I do not know who shot me, and I do not know who shot Mr. Studstill. Your Honor, I could not state how long it was after I was shot before anything happened that I can remember, because my mind was so mixed up with intoxicating drinks that I could not state, because I was almost what you would call mindless. I cannot recall distinctly different things.''

While it was encumbent upon the State to prove every element of the offense, the proof could be by evidence of circumstances that are sufficient to support the inferences of guilt of the offense found by the verdict.

Independent of the proffered dying declaration, there is evidence legally sufficient to sustain an inference that the defendant by culpable negligence or other unlawful act fired the shot that caused the death of the decedent under such circumstances as to constitute manslaughter. An intent to kill was not an essential element of the offense and intoxication did not excuse the defendant. See Kent v. State, 53 Fla. 51, 43 South. Rep. 773. Manslaughter is not a degree of murder, but it is a grade or degree of unlawful homicide. Boyett v. State, 69 Fla. 648, 68 South. Rep. 931.

Voluntary intoxication, even though the immediate effect of it is to render the person unconscious for the time of what he is doing or temporarily insane, as distinguished from a fixed or settled frenzy or insanity either permanent or intermittent resulting from such intoxication, does not excuse a homicide or any act which in the absence of such intoxication and unconsciousness or temporary insanity, the immediate effect of such intoxication, would be criminal. This is the general rule applicable wherever the voluntary doing of the wrongful act constitutes the crime or

a particular specific intent is not an essential or constituent element of the offense, and in all such cases a person who is at the time of the commission of the act unconscious or insane as the immediate consequence of voluntary intoxication is liable in the same manner and to the same degree that he would be if sober. Garner v. State, 28 Fla. 113, 9 South. Rep. 835.

There is evidence legally sufficient to sustain the verdict and there is nothing to indicate that the jury were not governed by the evidence in finding a verdict of manslaughter. Gee v. State, 61 Fla. 22, 54 South. Rep. 458.

No material or prejudicial error of law or of procedure appears and the judgment is affirmed.

TAYLOR, C. J., AND ELLIS, BROWNE AND WEST, J. J., concur.