THOMAS J. JOHNSON v. STATE.

152 So. 176.

Opinion Filed January 8, 1934.

*Marvin Green* and *R. G. Tittsworth,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Roy Campbell,* Assistant, for the State.

DAVIS, C. J.—Mitchell A. Franklin, for whose murder the defendant in this case was found guilty and sentenced to death, was proprietor of a lunch stand located on South Nebraska Avenue in the City of Tampa, Florida. On April 19, 1932, in an encounter with the defendant, Mr. Franklin was shot and mortally wounded between nine and ten o'clock in the morning. Deceased was a man over sixty years old, the defendant thirty-five. Franklin, it may be inferred from the evidence, was, among other things, a petty money lender and usury taker who, in undeniable violation of the Federal statutes on the subject,* had made a loan of four dollars to Johnson, who as security for the repayment of the loan with an added dollar for one week's interest, had deposited with Franklin his United States Army War Service Bonus certificate.

Defendant's version of the homicide was that he had called on Franklin at the latter's place of business in the negro quarter of the City of Tampa, where deceased was conducting a small lunch stand, cold drink dispensary, etc., in the body of a large automobile on a vacant lot near a paved street; that deceased had engaged in the practice of lending small sums of money to sailors and negroes, and had made a loan to defendant a month previously of the sum of $4.00 for one week, defendant to repay him $5.00, or one dollar a week interest until paid; that on this oc-

---

*Act of Congress of May 19, 1924, c. 157, No. 503, 43 Stat. 128, Sec. 643, Title 38, U. S. C. A., as amended by Act of Congress July 3, 1926, c. 751, No. 5, 44 Stat. 828, Sec. 643, 1928 Accumulated Annual Pocket Part.

casion defendant and deceased greeted each other with the usual morning salutation, neither evincing unfriendliness; that defendant was unarmed and on a lawful mission; that he inquired of deceased whether he still had defendant's bonus certificate and was informed that he did; that defendant asked deceased to accord him the privilege of seeing it, whereupon deceased asked if defendant wanted to pay the debt for which it was being held as security; defendant replied that he didn't have the money to spare right then, whereupon deceased stated that defendant could not see the certificate unless he was going to pay the debt.

The evidence from this point on is in some conflict. But it was of such nature as to warrant the trial jury in finding that defendant upon request therefor, obtained possession of a pistol and the cartridges for same from Franklin for examination (for what purpose the examination was to be made is not explained); that as soon as defendant got the pistol in his hands that he drew it upon deceased and demanded, under coercion of a threatening gesture made with the weapon in support of his demand, that deceased surrender up to defendant the latter's bonus certificate; that at the same time defendant reached into a pasteboard soap box nearby and took out of it a handful of deceased's money, which was in small change; that the bonus certificate was in this same box (although this fact is not shown to have been at that time known to defendant); that a struggle between defendant and deceased forthwith ensued; that as a result of the efforts of deceased to disarm defendant and as a result of the act of deceased in taking hold of the pistol in the course of the struggle, deceased was shot; that in the same scuffle defendant was also shot; that in all, three shots were fired, the third one being the one that inflicted the mortal wound. Defendant left the scene immediately after

the shooting and was apprehended on the same day and placed in jail. Both participants were white men.

At the trial, over objection of the defendant, the court admitted in evidence proof of an alleged dying declaration shown to have been made to a city detective under the following circumstances about two hours before declarant died: "W. D. Bush, City Detective, testified that he went to the operating table and said to Mr. Franklin: 'You are in a serious condition, aren't you?' And Franklin said, 'Yes.' Bush then asked him about his pain and Franklin said he was in 'lots' of pain. Bush then said, 'Do you know you are shot through and through?' And Franklin said, 'Yes, I do.' Bush then said, 'Do you know you are going to die?' And Franklin said, 'Well, I feel like it; I feel bad.' Then Bush said, 'Go on, Mr. Franklin, and tell me who shot you.'" Dr. Lancaster who attended the deceased in the emergency ward of the Municipal Hospital, testified that he told Franklin that his condition was serious and that he (the doctor) did not know whether the wounded man "would make the grade or not;" that Franklin himself replied that he knew he was in a serious condition and that if he did not get relief from the pain he knew he would die anyway because he could not live with the pain he was having. Upon being asked if Franklin expressed any hope of recovery, Dr. Lancaster said: "No, sir, he did not to me." Two hours after this Franklin was dead.

Whether a sufficient and proper predicate has been laid for the admission in evidence of a dying declaration, is a primary matter for determination by the trial court, being a mixed question of law and fact, and the judgment of the trial court thereon is entitled to great weight, every presumption being in favor of its correctness. Such ruling is subject to appellate review, but it will not be disturbed

unless it clearly appears to be erroneous. That declarant at the time of his dying declaration, entertained no hope of recovery, and that he knew and appreciated his condition as being that on an approach to certain and imminent death may be gathered from proof of the surrounding circumstances, as well as from all the circumstances of the case. It is not indispensable that deceased declare *totidem verbis* that he entertains no hope whatever of recovery, and realizes that death is imminent and unavoidable, where he understood the nature of his injury is such as to establish beyond all reasonable doubt that declarant must have known and believed he was talking as a man on the threshold of mortal dissolution. Sealy v. State, 89 Fla. 439, 105 Sou. Rep. 137; Richardson v. State, 80 Fla. 634, 86 Sou. Rep. 619; Gardner v. State, 55 Fla. 25, 45 Sou. Rep. 1028; Bennett v. State, 66 Fla. 369, 63 Sou. Rep. 842; Folks v. State, 85 Fla. 238, 95 Sou. Rep. 619; Copeland v. State, 58 Fla. 26, 50 Sou. Rep. 621; Malone v. State, 72 Fla. 28, 72 Sou. Rep. 415.

So there was no error in admitting proof of the dying statement of deceased which was as follows:

"I asked Mr. Franklin, after he told me that he thought he was going to die, who shot him and he said a man by the name of Johnny Johns was all of the name he knew him by. I asked him where he lived, and he said he stayed around the Seaman's Institute. He said that he had loaned this fellow four dollars on a bonus certificate about a month, I believe, before that. This fellow came there and stayed around a few minutes and talked to him and asked him if he had his bonus certificate and he told him yes he still had it. * * * He asked him did he still have it and he told him yes, and he said, 'Let me see it.' He said, 'Do you want to pay me?' And he said, 'No, I haven't got the money now.' and he said, 'Well, you can't see the bonus certificate unless

you are going to pay me.' He stayed around a little while, and said, 'Let me see that gun, Mr. Franklin.' And he said he had taken the shells out of a .38 S. & W. and handed it to him. I am wrong there. He first handed him a .32 automatic and took the shells out of it, and he looked at it and said, 'So you have got another gun?' Mr. Johnson said to him, 'You have got another gun.' And he said, 'Let me see the other one.' And he handed him the .38 and took the bullets out of it. And he said, 'Let's look at those shells.' And Franklin said he loaded the .38 and at the same time reached his hand to a pasteboard box that was sitting near the gasoline can where you pump gasoline out of it, and said, 'God damn you, give me my bonus certificate.' And Franklin said he reached to grab at the gun, and they scuffled out of the door and the first time he got shot he was hit in the arm here, Mr. Franklin, and the next time he got shot, if I remember correctly, the bullet went in right about here and came out about here.' " (indicating.)

In addition to the foregoing, Detective Bush, who was relating the dying declaration from memory, stated that Franklin, when asked to tell about the defendant taking some money from him, said that the defendant reached over in the box about the same time he threw the pistol on him and took out a handful of change.

The law regards the declarant, when in the presence of imminent and inevitable death, as being under as solemn an inspiration to tell the truth as though he were pledged thereto by an oath. Dying declarations *eo nomine* are admissible, however, only as a distinct exception to the hearsay evidence rule. The rule as to the admissibility of dying declarations as such, should not be confused with the rule which, under certain conditions, renders dying exclamations admissible in evidence as part of the *res gestae*.

The *formula* for proving a dying declaration is ordinarily to show, by the alleged dying declaration itself, that the declarant at the time he made it, therein and thereby expressed himself in such manner as to show that he understood and appreciated that he was making a dying declaration with full realization as he was doing so that he was declaring himself as a man who realized that his own death was imminent and inevitable. But where the substance of what is required by this formula as a condition precedent to the admission of a dying declaration, is otherwise made to appear from all of the circumstances, although not *totidem verbis,* the prescribed matters of mere *formulae* may be disregarded, and the dying declaration received in evidence, despite the failure of the proponent of it in evidence to prove that the deceased said in so many words accompanying his utterance and dying declaration, that he then realized the immediate and inevitable approach of his own mortal demise. This is the purport of the rule laid down as long ago as Dixon v. State, 13 Fla. 636, and to that effect it has been reaffirmed in different form in many cases decided since that time.

So we hold that the predicate established for the introduction in evidence of the statements of the deceased, Mitchell A. Franklin, to City Detective Bush met the requirements of the law for the reception in evidence of what was said by Franklin, as his dying declaration.

The next error argued is that the trial judge erred in refusing, on objection of the State Attorney, to permit the defendant, appearing as a witness in his own behalf, to answer the following question asked of him on redirect examination by his own counsel:

"Q. Did you take any money from Mr. Franklin, either from his person or from any place within his store?"

The ground of objection to this question interposed by the State Attorney, was that the question was not a proper one to be asked on redirect examination of the witness. It was on that ground that the court appears to have sustained it.

And so it is that defendant claims here on this writ of error that as a witness in his own behalf upon his trial for first degree murder, based upon the theory (in part, at least) that the homicide was pepetrated by defendant in an attempt on his part at robbery of deceased by taking money from his person, or personal presence, he was erroneously denied the right to make his sworn personal denial of the State's accusation that he perpetrated or attempted to perpetrate a robbery against the person of the man he killed, at the time of the killing.

Sustaining the State Attorney's objection to this question was reversible error.

The cross examination of the State had gone fully into all that happened at the time of the shooting. Both deceased and defendant had been wounded in the scuffle that ensued incident to the dispute over the bonus certificate. Defendant testified that the argument over the bonus certificate was the sole cause of the resultant shooting. The State had previously attempted to prove that a robbery of money from deceased's cash box was a concurrent, if not the sole motive, for defendant's attempted intimidation of deceased with a pistol. Questions had been asked by the State's Attorney throughout the cross examination of defendant with the obvious purpose of circumstantially supporting the accusation of robbery contained in the dying declaration it had introduced on the proposition of alleged taking of some money from deceased's cash box.

It was therefore entirely proper for the accused on his

redirect examination as a witness to be interrogated by his counsel and he should have been permitted to then and there answer the direct question whether or not he had at the time of the shooting, or just before the shooting, taken any money away from Mr. Franklin, either from his person or from any place within his store.

To deny defendant his valuable privilege of so testifying, was to withhold from him his right to refute under oath before the trial jury a material and important element of the State's proof of its charge of murder in the first degree for which he was on trial. No other evidence to cure this error was admitted. The error was material and harmful to the defense. So the only way the prejudice of it to defendant's rights can be removed is to reverse the conviction and sentence to capital punishment and grant the defendant a new trial, and it is so ordered.

Reversed for a new trial not inconsistent with the holding of this opinion.

WHITFIELD, ELLIS, BROWN and BUFORD, J. J., concur.