CHARLES P. COCHRAN, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed February 4, 1913.

1. When it appears that no injury could accrue to a defendant by an irregularity not amounting to a substantial departure from the requirements of law in the selection and empanel- ling of jurors, an objection thereto should not avail.

2. Where the insanity of the accused is a material issue in a criminal prosecution, the court should by charges appropriate

to the evidence in the case, submit to the jury for their determination the question whether the accused at the time of the unlawful act alleged against him had a sufficient degree of reason to know that he was doing an act that was wrong.

3.  In order to acquit on the ground of insanity, a defendant charged with homicide, he must have been insane at the time the unlawful act was committed.

4.  It is not sufficient that a defendant was insane before or after or both before and after an alleged unlawful act, but he must have been insane at the particular moment of the homicide. If, however, insanity of a permanent type or continuing nature, or characterized by a habitual and confirmed disorder of the mind, not temporary or occasional, is shown to have existed prior to the commission of the act, it would be presumed to continue up to the commisison of the act, unless the presumption be overcome by competent evidence.

5.  The mental effects of a mere voluntary intoxication may not *excuse* the commission of an unlawful act or relieve from its consequences; but if excessive and long continued use of intoxicants produces a mental condition of insanity permanent or intermittent, which insane condition exists when an unlawful act is committed, such insane mental condition may be of a nature that would relieve the person so affected from the consequences of the act that would otherwise be criminal and punishable

6.  Where there is substantial though conflicting evidence of a mental unsoundness of the accused at the time of the unlawful act alleged, which mental condition was not caused by a mere voluntary intoxication, or was not merely "moral insanity" or an "irresistable impulse," the trial court should give appropriate charges on the issue of the sanity or insanity of the accused at the time of the unlawful act, when it is a material issue, so that the jury may be correctly and fully advised or the law applicable to all the evidence.

7.  Where material error in charging the jury occurs and it appears from the record that the jury reasonably could have

been misled by such error to the injury of the defendant, a reversal may result.

Writ of error to the Circuit Court for Monroe County.

Judgment reversed.

*C. B. Parkhill,* and *L. A. Harris,* for Plaintiff in Error;

*T. F. West,* Attorney General, and *C. O. Andrews,* for the State.

WHITFIELD, J.—Cochran was indicted for murder in the first degree and was convicted of murder in the second degree. Pleas in abatement were overruled on demurrer and errors are assigned thereon. One plea avers that 510 names were on the list of names selected by the County Commissioners to serve as jurors and that 13 names were stricken by erasures and at least one of the 13 names that were so erased was placed in the box. Another plea avers that the jury list was not forthwith recorded. It does not appear that the jury list was tampered with, and the erasures of surplus names did not render the list invalid. Even if one of the erased names was placed in the box, it had been selected, and the number put in the box was then below the statutory maximum. Mere failure to record the list at the time it was made was an irregularity not fatal to the list. The defendant is not shown to have been injured by any of the irregularities complained of. Keech v. State, 15 Fla. 591.

A plea avers that the court drew the names of the persons to serve as grand jurors from a box containing 37 names instead of 36 names as directed by the statute. It is not averred that any one of the 37 persons whose

names were in the box was not a proper juror and no harm is shown to have resulted to the accused from the irregularity of having the names of 37 instead of 36 persons who had been duly chosen for jury duty from among whom the grand jury was drawn.

It is alleged that the name of a person was drawn from the jury box when it had not been selected by the County Commissioners, but it does not appear that such person served on the grand jury which indicted the accused. It does not appear that the members of the grand jury who found the indictment against the defendant were not competent and qualified jurors. When it appears that no injury could accrue to a defendant by an irregularity not amounting to a substantial departure from the requirements of law in the selection and empanelling of jurors, an objection thereto should not avail. See Young v. State, 63 Fla. 55, 58 South. Rep. 188; Colson v. State, 51 Fla. 19, 40 South. Rep. 183; Penton v. State, decided at the last term.

It appears that about 7:30 or 8 A. M., R. T. Cauthron and E. E. Gibson, two railroad locomotive engineers, together entered a building known as the Bank Buffet Club. After taking beer they went into a middle room where a slot machine was. Cauthron testified: "Gibson and myself goes out into the middle room, and while I was playing the slot machine, shooting nickles into it, there was two men, Mr. Cochran there (indicating defendant) and another fellow sitting at the table, and they were arguing something about a bowl of soup, and I kept shooting the nickles in, and Gibson said 'let's not hear any of that trouble—let's go.' So we turned around and started out. As we got itno the front room, he came running out and made a remark 'I want to kill a railroad man anyhow.' As he done so he brings the gun from

his hip pocket (Witness illustrating movement) and throws it down on me, and as he done that I knocked the gun off with my left hand, and just as I hit the gun, the gun went off, and at that time E. E. Gibson grabbed at him, and he jumped back from him and threw the gun down on him and shot Gibson. Gibson made the remark to me 'My God, Bob, I'm shot—get out of here.' In the meantime Cochran had me fouled with the gun and I couldn't get to him, and I runs out on the porch and runs down the step and when I got to the bottom of the step, to the little platform there, I don't know how high it is, I jumped off that into the alley. I hesitated there a little bit, I don't know how long—Gibson didn't show up and I went up stairs to the room where the shooting occurred and no one was in there. And I went back in the bar and found Gibson's body laying over on the right hand side of the hallway" ............

After the shooting a person in the building took the pistol from accused without much resistance. Accused "didn't seem to have much strength." He then sat languidly in a chair till arrested. It does not appear that the accused had ever before seen the deceased, or his companion. No motive appears.

The testimony of several witnesses was introduced showing without contradiction that for several months prior to the homicide, the accused had been a heavy drinker of intoxicating liquors and that he was frequently very drunk; that when he was drunk he appeared very nervous and stared out of his eyes; appeared to be under the influence of dope or something. There was also testimony at least tending to show that the mind of the accused was seriously affected by the excessive and long continued use of intoxicating liquors. One witness who saw the accused at the Club just before the homicide

testified that he ran away when called by the accused because accused was drunk and looked stary out of his eyes, and witness was scared of him; that accused had frequently been drunk and would tremble and say he was in such a state he could not stop drinking. Another witness testified that he was at the Club all night before the killing and saw accused drink a quart of brandy between 6:30 and 12 P. M.; that the accused was in "bad condition—he was crazy—something like that;" that witness thinks accused did not know what he was doing at all; that accused played cards during the night. Another witness for the defense testified that he was in the club room about twenty minutes before the shooting and saw accused take three drinks of whiskey; that the accused was pretty drunk; "he didn't act like the same man as I knew him before; .................. he looked around in a dazed way and his eyes were all bloodshot ............................. he sort of acted mad." A witness testified that after the homicide he put the accused in a cell and that he looked like a man under the influence of dope of some kind; that it was five o'clock in the afternoon when he "showed any consciousness of knowing anything." Another witness had often seen accused drink and "sometimes thought he was crazy;" "sometimes he was rational and sometimes positively irrational." A physician testified that long protracted drunkenness will produce delerium tremens which means that the person is mad or crazy or a maniac. A man with such a mania may do sensible as well as unsensible things and not know what he is doing.

There being also evidence that the accused was not insane or crazy or irrational, the testimony presented a material issue of the mental responsibility of the accused, upon which he was entitled to have appropriate charges

given to the jury for their guidance in settling the conflicts in the evidence and in determining the degree of guilt or the innocence of the accused.

The court gave to the jury charges upon the degrees of unlawful homicide as defined by the statutes. Among other charges given was the following:

"If the jury believe from the evidence that Charles P. Cochran killed E. E. Gibson as charged in the indictment, and at the time of such killing Charles P. Cochran was under the influence of liquor voluntarily taken by him, then such intoxication so produced, is, in law, no excuse for the act done by the defendant, unless the jury believe from the evidence that such intoxication was such as did, in fact, deprive him, at the time of the killing, of the mental capacity to form a malicious purpose to kill, in which event they may find the defendant guilty of murder in the second degree or manslaughter."

The effect of this and other charges given was to limit the jury to a consideration of the guilt of the accused of murder in the second degree or manslaughter. There was some substantial evidence that the accused was in an abnormal mental condition for some time before and just before and after the homicide, which may or may not have existed at the time of the homicide and which may or may not have affected his criminal responsibility; and the court should have given an appropriate charge upon this issue, which issue was not confined to a mere voluntary intoxication. The jury should have been properly instructed to determine the sanity of the accused at the time of the homicide.

Where the insanity of the accused is a material issue in a criminal prosecution, the court should by charges appropriate to the evidence in the case submit to the jury for their determination the question whether the accused

at the time of the unlawful act alleged against him had a sufficient degree of reason to know that he was doing an act that was wrong. Davis v. State, 44 Fla. 32, 32 South. Rep. 822. The phase of insanity commonly known as the "irresistable impulse" or "moral insanity" doctrine is not recognized in this State as an excuse for an unlawful act. Williams v. State, 45 Fla. 128, 34 South. Rep. 279; Copeland v. State, 41 Fla. 320, 26 South. Rep. 319.

"Intoxication does not excuse or mitigate any degree of unlawful homicide except murder in the first degree, unless as a result of such intoxication there be a fixed or settled frenzy or insanity either permanent or intermittent." Thomas v. State, 47 Fla. 99, text 106, 36 South. Rep. 161; Garner v. State, 28 Fla. 113, 9 South. Rep. 835.

In order to acquit on the ground of insanity a defendant charged with homicide, he must have been insane at the time the unlawful act was committed. It is not sufficient that he was insane before or after or both before and after, the unlawful act, but he must have been insane at the particular moment of the homicide. If, however, insanity of a permanent type or continuing nature, or characterized by a habitual and confirmed disorder of the mind, not temporary or occasional, is shown to have existed prior to the commission of the act, it would be presumed to continue up to the commission of the act, unless the presumption be overcome by competent evidence. Armstrong v. State, 30 Fla. 170, 11 South. Rep. 618; Davis v. State, 44 Fla. 32, 32 South. Rep. 822.

The mental effects of a mere voluntary intoxication may not *excuse* the commission of an unlawful act or relieve from its consequences; but if excessive and long

continued use of intoxicants produces a mental condition of insanity permanent or intermittent, which insane condition exists when an unlawful act is committed, such insane mental condition may be of a nature that would relieve the person so affected from the consequences of the act that would otherwise be criminal and punishable.

The court refused to give the following charges requested by the defendant, and error is assigned thereon:

"If you gentlemen of the jury believe from the evidence beyond a reasonable doubt that the defendant shot and killed the deceased, still if the jury further believe from the evidence that the defendant at the time he so killed the defendant was in such a state of fixed or settled frenzy or mental insanity induced by antecedent and long continued use of intoxicating drinks or liquors, and not produced by the immediate effect of intoxicating drinks, as not to have been conscious of what he was doing, or that the act was wrong, you will find the defendant not guilty."

"The jury are further instructed that although you may believe from the evidence that the defendant shot and killed the deceased, E. E. Gibson, still if the jury further believes from the evidence, that at the time he so killed the deceased, Gibson, the defendant was so affected by what is known as delerium tremens that he did not know the nature of the act, not whether it was wrong or not, and that such delirium was induced by antecedent and long continued use of intoxicating drinks, and not as the immediate effect of intoxication, then the defendant cannot be held criminally responsible for such act, and the jury should find the defendant not guilty."

In view of the evidence as to the mental condition of the accused, these charges should have been given in order that the jury may have determined the issue of the mental responsibility of the accused in committing

the homicidal act. Whether the jury would have determined the defendant to have been mentally unsound or not, the defendant had a right to have the jury pass upon the issue made by the evidence and insisted on at the trial.

In a prosecution for murder where the sanity of the accused at the time of the homicide is presumed, or where there is evidence merely of a voluntary intoxication of the accused at the time of the unlawful act, or where there is no real issue of sanity or insanity of the accused when the unlawful act was committed, a charge upon the question of insanity of the accused at the time of the homicide may be improper and a verdict of murder in the second degree may be proper on the evidence. But where there is substantial though conflicting evidence of a mental unsoundness of the accused at the time of the unlawful act alleged, which mental condition was not caused by a mere voluntary intoxication, or was not merely "moral insanity" or an "irresistable impulse," the trial court should give appropriate charges on the issue of the sanity or insanity of the accused at the time of the unlawful act when it is a material issue so that the jury may be correctly and fully advised of the law applicable to all the evidence. A refusal by the court to give proper charges on such a material issue may be reversible error even though had appropriate charges been given the jury may have found the same verdict below murder in the first degree. Where material error in charging the jury occurs and it appears from the record that the jury reasonably could have been misled by such error to the injury of the defendant, a reversal may result. See Scott v. State, decided at last term. Voluntary intoxication with reference to murder in the first degree is not involved in this discussion.

The court gave the following charges:

"Murder is the unlawful killing of a human being with malice aforethought. Such malice may be expressed or implied. It is expressed when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing, show an abandoned and a malignant heart."

"Malice means that consideration of the mind which prompts one to do a wrongful act intentionally, without legal justification or excuse. It does not mean mere spites, hatred or ill will, but signifies that state of disposition which shows a heart regardless of social duty and fatally bent on mischief and malice aforethought means that the act was done with malice and premeditation."

These latter charges are not germain to the statutory definitions of murder and were not appropriate to the evidence in this case. A material issue being the mental condition of the defendant, the refusal of the court to give full and appropriate charges on that subject and the giving of irrelevant charges on the subject of malice, express and implied, were well calculated to confuse the jury to the defendant's injury by distracting their attention from the main issue presented and insisted on by counsel for the accused.

The other contentions made have been considered, but they do not require discussion here.

The judgment is reversed and a new trial awarded.

SHACKLEFORD, C. J., AND TAYLOR, COCKRELL AND HOCKER, J. J., concur.