NAT RICHARDSON, *Plaintiff in Error,* v. THE STATE OF FLORIDA, *Defendant in Error.*

Opinion Filed October 30, 1920.

1. Evidence of dying declarations is admissible only in cases where the declarant has abandoned all hope of recovery from the injury received at the hands of the accused, and is convinced that his death is inevitable and near at hand. But in passing upon the question of whether the declarant was in such mental state at the time of making the declaration as

to render it admissible under the foregoing test, resort may be had to all the circumstances of the case and expressed utterances are not essential.

2. Whether a sufficient and proper predicate has been laid for the admission in evidence of dying declarations is a primary matter for determination by the trial court, being a mixed question of law and fact, and the judgment of such court thereon is entitled to great weight, every presumption being in favor of its correctness, but such ruling is subject to review by an appellate court, though it will not be disturbed, unless it clearly appear to be erroneous.

3. Premeditated design to effect death is an essential element of the crime of murder in the first degree, and where the evidence offered is insufficient to establish this element of the crime a judgment upon a verdict finding the defendant guilty of murder in the first degree will be reversed.

A Writ of Error to the Circuit Court for Putnam County; James T. Wills, Judge.

Reversed.

*J. V. Walton,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *D. Stuart Gillis,* Assistant, for the State.

WEST, J.—Plaintiff in error, referred to in this opinion as defendant, was indicted on a charge of murder in the first degree. He was found guilty as charged and sentenced to be hanged. Motion for a new trial was denied. Writ of error was taken from the judgment imposing sentence and the case is here for consideration by this court.

The first assignment of error challenges a ruling of the trial court admitting in evidence over objection of

defendant a written statement purporting to be a dying declaration of deceased. This statement is as follows:

"State of Florida, County of Duval,
"Jacksonville.

"I, Ray Butts, realizing that I am about to die, and that it is impossible for me to recover, and being conscious of my condition, and in the very article of death, do make this my dying declaration and state the following to be the truth, the whole truth and nothing but the truth. I started back to the cab and met negro on cab steps I asked him what he wanted and he started to draw his pistol from his bosom I then drew my pistol and shot twice before he fired, his first shot struck me either in the face or shoulder I don't know which after I fell he shot me in the buttox. I had been warned that two negroes were on my train, and they were dangerous and to be careful. That is the reason I did not take any chance and shot first.

|  | his |
| "Witnesses | Ray X Butts |
| J. E. Butts | mark |
| O. K. Robinson | |
| Geo. E. Welch. | |

"Subscribed and sworn to before me a Notary Public this 28th day of September, A. D. 1919.

"FRANK P. BEDDOW,
"Notary Public, State of Florida.
"My commission expires July 6th, 1920.
"(Notarial Seal)"

The contention made in support of this assignment is that no sufficient predicate had been established for the admission in evidence of a dying declaration.

Evidence of dying declarations is admissible only in cases where the declarant has abandoned all hope of recovery from the injury received at the hands of the accused and is convinced that his death is inevitable and near at hand. But in passing upon the question of whether the declarant was in such mental state at the time of making the declaration as to render it admissible under the foregoing test, resort may be had to all the circumstances of the case and expressed utterances are not essential. Copeland v. State, 58 Fla. 26, 50 South. Rep. 26; Lester v. State, 37 Fla. 382, 20 South. Rep. 232; Richard v. State, 42 Fla. 528, 29 South. Rep. 413.

The deceased, who was a train conductor, was shot by the defendant in Palatka, and was taken from Palatka to Jacksonville, where he died on the following day from the wounds received. Dr. Pittman, one of the physicians who treated deceased, and operated upon him in an effort to save his life, as a witness in behalf of the State, described the wounds upon his body and his condition at the time. From the evidence of this witness it appeared that the bladder and intestines of the deceased were pierced by a ball from the pistol of defendant with which deceased was wounded, and that at the time of the operation, which was performed soon after he reached Jacksonville on the same day that he was wounded, his "abdomen was full of blood from internal hemorrhage." This witness was present at the time the dying declaration offered in evidence was made. He testified that deceased "was suffering pain, but fully conscious at the time the statement was made and absolutely understood what he was doing."

The deputy sheriff who obtained the dying declaration, as a witness for the State, testified that he "wrote the

statement and read it over to Mr. Butts (the deceased) and he swore to it in the presence of a notary public." On cross-examination this witness said: "I wrote the statement just as Mr. Butts told me, and then read it to him and asked him if that was exactly as it was. He dictated it and I wrote it just as he told me. Dr. Pittman, a physician at St. Luke's Hospital, Mr. Beddow, a Notary Public, Mr. Robinson, Dr. Welch, and the nurse getting ready to administer the ether, were present. They held it up a few minutes. Mr. Butts knew he was going to be operated on."

The notary public before whom the declaration was sworn to, as a witness for the State, testified that he heard the deceased when he dictated the statement to be written and heard it read to him, that deceased could not sign it because of the wound in his hand, "but he held the pen."

Upon this showing the statement set out above was offered and admitted in evidence. In Malone v. State, 72 Fla. 28, 72 South. Rep. 415, this court said: "Whether a sufficient and proper predicate has been laid for the admission in evidence of dying declarations is a primary matter for determination by the trial court, being a mixed question of law and fact, and the judgment of such court thereon is entitled to great weight, every presumption being in favor of its correctness, but such ruling is subject to review by an appellate court, though it will not be disturbed, unless it clearly appear to be erroneous." Lowman et al. v. State, 80 Fla. —, 85 South. Rep. 166, and cases cited.

The statement offered contained the essential requiremends of the preliminary showing necessary to make it admissible as a dying declaration. It had been shown

that deceased was "fully conscious" at the time he made the statement and absolutely understood what he was doing; that it was dictated by him, read to him after being written, and was sworn to before an officer. There was therefore no error in admitting it at that time.

When the State had rested Dr. Pittman was recalled by the defendant for further cross-examination. At that time he testified as follows: "Mr. Butts understood that he was to be operated upon. We told him the operation was a serious one; that his condition was serious and he understood that he was in a serious condition. I do not think anything was said to him about the success of the operation; that we did not know what the ultimate result of the operation might be; gave him to understand that he would better make the statement before the operation, as he might not survive the operation. I do not know that he had abandoned hope of recovery at the time of making the statement. I do not know whether he had or not."

Dr. Welch, a physician who attended deceased at Palatka and accompanied him to the hospital in Jacksonville, was called as a witness for defendant. Upon the point under consideration he testified as follows: "I was present when the dying declaration was made in Jacksonville and I signed it as a subscribing witness. I do not recall whether Conductor Butts dictated the whole of that declaration or not. At the time he started to make his declaration I was in there, but I did not know I was going to have any part in it at all. Several were present. The Deputy Sheriff came in and asked him to make a statement. He talked with Dr. Pittman first—getting permission to obtain this statement—and I heard nothing that was said to Mr. Butts prior to his making the

statement. The first thing that attracted my attention is that Butts stated that he shot the negro first—that was the first time I heard that he had shot the negro first and that is all that I paid any particular attention to. I do not know whether Mr. Butts was informed that he was going to die. I went to Jacksonville with Conductor Butts. Well, I think hope was held out to him as to the outcome of the operation—that hope was held out. Whether he was told at that time by the doctors present I do not know."

When this testimony had been given counsel for defendant moved the court to strike the dying declaration which had been received in evidence upon the ground that it appeared that all hope of recovery had not been abandoned by deceased at the time the declaration was made. There was no error in the denial of this motion. The quoted evidence contains nothing sufficient to overcome the positive assertion of the deceased to the effect that he realized the impossibility of his recovery. In fact, considering all the circumstances of the case, this evidence seems to us to tend to strengthen rather than weaken the preliminary proof necessary as a predicate to the admissibility of the dying declaration, which was a part of the statement itself.

The deputy sheriff who took the statement of the deceased was recalled by the defendant for further cross examination. Upon this examination he testified that the portion of the statement showing the state of mind of the deceased and consciousness of impending death was his (witness') composition; that he did not suppose the deceased "would know about that part of it," but stated again at this time "that the whole thing was read to him."

There was no motion to strike the dying declaration after this testimony was given.

It is clear, as we have seen, that there was no abuse of discretion or error in admitting the dying declaration in the first instance on the showing then made, nor in denying the motion to strike it which was subsequently made, and, while no motion was made after the last recited testimony had been introduced to then test the question of the admissibility of the dying declaration, in view of the sentence of death imposed upon the defendant we have carefully examined the question, and in the light of all that has been said herein conclude that there was no error in permitting the jury to consider the dying declaration with all the other evidence in the case in making up their verdict. Although deceased did not dictate the preliminary part of the statement before it was written, it appears that at the time it was signed by him he was in the full possession of his mental faculties, was apprised of its contents before he signed it, and was "fully conscious" of what the statement contained and of what he was doing. The shooting of deceased by defendant was not denied. It was admitted by defendant himself. Other witnesses who were near by at the time of the shooting testified at the trial of the case. The only purpose served by the dying declaration was to supply some details of the encounter not covered by the testimony of other witnesses.

The refusal of the trial judge to give a requested instruction to the jury on the law of self defense is assigned as error. This subject was fully covered in an instruction given and it is not error to refuse to give requested instructions when the point is covered by instructions given.

One of the grounds of the motion for a new trial is that the verdict is contrary to the evidence. Premeditated design to effect death is an essential element of the crime of murder in the first degree. The circumstances attending the shooting of deceased by defendant are stated in the declaration of the deceased, which we have held admissible. Meeting the defendant deceased shot twice at him before defendant fired. Defendant drew his gun, fired immediately at deceased, mortally wounding him. There is no evidence of other facts or circumstances in the record sufficient to show the existence of a premeditated design to kill by defendant or from which such design may be legitimately inferred. In the absence of such proof the offense alleged in the indictment is not proved. The case is to be tried again and we will therefore not discuss the evidence.

There is error in the order overruling defendant's motion for a new trial and the judgment must be reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., specially concurring.

BROWNE, C. J., specially concurring.

I concur in the conclusion and in the opinion, except as it finds no reversible error in the admission as a dying declaration of the statement of the wounded man, part of which was composed by a deputy sheriff and part taken down as dictated by the deceased.

The introductory recital in the wounded man's declaration, that "I Ray Butts realizing that I am about to die, and that it is impossible for me to recover, and being apprised of my condition, and in the very article of death

do make this my dying declaration and state the following to be the truth the whole truth and nothing but the truth," taken by itself and unexplained or contradicted by other evidence, might be sufficient to make the declaration admissible. There is uncontradicted testimony that the deceased did not know "that his death was imminent and inevitable and that he entertained no hope whatever of recovery," as is required in this State as a preliminary foundation to make such declarations admissible. Lester v. State, 37 Fla. 383, 20 South. Rep. 232.

This preliminary, vital and essential part of the declaration was composed and written by a deputy sheriff, and taken to where the injured man was being prepared to undergo an operation in the hope of saving his life, after which he took down the rest of the statement, and then read the whole of it to him. The purpose of reading it to the deceased was that he might know before signing that his words had been correctly transcribed, and in that frame of mind the declarant would not be apt to give special care and attention to the preliminary part, but would fix his faculties upon the part that he had dictated.

The deputy sheriff who composed the essential part of the declaration testified: *"I didn't suppose he would know about that part of it."* "The rest of it" (meaning the dying declaration) "was his." If the statement of how the shooting occurred was all of the declaration that "was his" that part wherein he is made to say that he realizes that he is "about to die and that it is impossible for me to recover" is not "his." The attending physicians did not know that it was impossible for the

wounded man to recover at the time he made this state-
ment. How then could the wounded man know it?

Dr. Pittman, a witness for the State, testified: "Mr.
Butts understood that he was to be operated upon. We
told him the operation was a serious one; that his con-
dition was serious and he understood that he was in a
serious condition. I do not think anything was said to
him about the success of the operation; that we did not
know what the ultimate result of the operation might be;
gave him to understand that he would better make the
statement before the operation as he *might not* survive
the operation. *I do not know that he had abandoned
hope of recovery at the time of making the statement.* I
do not know whether he had or not. I always endeavor
to build up the spirits as much as I can (meaning the
spirits of patients about to go under operation) and
probably did in this instance."

Dr. Welch testified: "I think hope was held out to him
as to the outcome of the operation—that hope was held
out" and "I did not know that Mr. Butts could not live.
We know of cases as severely wounded as that that have
lived—nevertheless his chance was very small."

The physicians who performed the operation must
have felt that there was a chance of the wounded man's
recovery else they would not have performed an opera-
tion on him. We cannot conceive of reputable physi-
cians—such as those who were in attendance upon the
wounded man—cutting up a person if they knew there
was no possible chance of his recovery. If they did not
know it, the wounded man did not know it. The very
fact that an operation was to be performed upon him
necessarily caused him to believe that there was a chance
of recovery. The doctors did not know—the wounded

man did not know—that *"every hope* of this world was gone." Dixon v. State, 13 Fla. 636.

I cannot conceive of a person "fully conscious"—as one witness says the wounded man was—submitting to anaesthesia, and consenting to be mutilated—nor can I conceive of reputable physicians doing such a thing—if they and he "knew" that *"every* hope of this world was gone," and that death was imminent and impending. It is not the belief of the certainty of death, that makes dying declarations admissible. All mankind knows of its "certainty." The knowledge that it is imminent and impending, and that "every hope of this world had gone" is what is essential to make dying declarations admissible. The fact that he consented to the operation—the fact that the doctors were willing to and did operate on him—is an absolute negative to any belief on his or their part of the absolute inevitableness of death, and that it was imminent and impending.

I think the declaration was improperly admitted in evidence.

---

TAYLOR, J., Concurring.

I concur in the judgment of reversal in this case. But there is another, to my mind, serious question as to the admissibility of the *ante mortem* statement of the deceased *as a whole.* This statement winds up with the following sentences: "I had been warned that two negroes were on my train and they were dangerous, and to be careful." "That is the reason I did not take any chances and shot first." This so-called warning to the deceased

of the fact that two negroes were on his train who were dangerous characters, that had a strong tendency to injuriously affect the defendant in his trial, was the veriest hearsay, that had no proper place as a part of the *ante mortem* statement of the deceased, and the fact of its being made a part of a dying declaration does not add anything to its admissibility in evidence, or change its character in the least as legally prohibited hearsay. While I greatly doubt the admissibility of any part of this dying declaration because of the unsatisfactory proofs of the predicate for its admission, yet upon another trial of the case I do not think that the last two above quoted sentences of said written dying declaration should be permitted to go to the jury. I think also that the evidence fails to establish the requisite premeditated design.