JOHNNY SMITH v. STATE.

176 So. 506.
Division A.
Opinion Filed October 4, 1937.
Rehearing Denied November 4, 1937.

*C. P. Diamond, J. W. Boring* and *C. Clyde Atkins,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Tyrus Norwood,* Assistant Attorney General, for the State.

BUFORD, J.—Writ of error brings for review judgment of conviction of murder in the first degree without recommendation to mercy.

Plaintiff in error presents six questions as to which he requests our consideration. Question One, as stated by plaintiff in error, is as follows:

"1. On an issue as to whether names in jury box were selected by County Commissioners as a Body or by the

Commissioners as individuals, it was shown that each of the five County Commissioners selected a list of names from the registration books of his District, and that in such selection the other four Commissioners did not participate; that the sheets containing names thus selected by the five Commissioners were fastened together and verified by the Commissioners. Was that a personal selection of names for the jury box by the Board of County Commissioners as a body as required by law?"

As stated by the Attorney General, the question is framed as follows:

"Question 1. Are the provisions of Section 4444, Compiled General Laws of Florida, 1927, relating to the selection of jury lists, sufficiently complied with by the County Commissioners, when each of the County Commissioners personally makes from the registration books in his district, a list of persons qualified to serve as jurors, which lists of names are then submitted to each of the other County Commissioners and approved by them as a Board, and which lists are then fastened together and certified in accordance with Section 4444?"

We think the latter is the better statement of the question involved.

Questions Two and Three are involved in Question One, and will be answered in discussing that question.

Question Four, as stated by the plaintiff in error, is as follows:

"In murder trial a witness for the State gave testimony on direct examination to the effect that he saw defendant shortly after fatal assault, about a mile and a half from scene of crime, and exchanged some words with defendant, and then the witness in answer to question of State attorney gave this testimony, with reference to defendant:

" 'He stood up there and he didn't look right—'
"Was that testimony subject to motion to strike?"

Question Five is as follows:

"Defendant, an ignorant negro, was arrested and placed in county jail, on suspicion that he had committed or participated in a murder. The second day he was in jail, the jailer, a white man, told the negro that the only way he, the negro, could save his life would be to confess. Later the negro signed a confession, and gave testimony before grand jury in nature of a confession. Did the jailer's statement to the negro render the confessions inadmissible?"

Question Six is as follows:

"Defendant shot deceased with a shotgun loaded with Number eight bird shot, and immediately after firing the shot, threw the gun down and ran away. About time defendant ran away, deceased was shot through the abdomen with a 38-caliber pistol bullet fired by a person other than defendant. Deceased lived several hours after being shot. Physician who made *post mortem* examination of deceased testified that either shot was capable of producing death. In that situation was defendant entitled to have the jury given requested charges embodying the proposition: That if the jury should find from the evidence that deceased died from the effects of a wound inflicted by a person other than defendant, and that such wound was inflicted after defendant had abandoned all criminal intent, defendant could not be convicted?"

Reverting to Question One. The record shows that the County Commissioners from each of the County Commissioner's Districts prepared from the registration books a list of persons qualified to serve as jurors from his respective district; that the list of names prepared by each of the County Commissioners, respectively, was submitted during

a meeting of the Board of County Commissioners held for the purpose of preparing the jury list to each of the other members of the Board of County Commissioners; that such lists so prepared were respectively approved by the members of the Board of County Commissioners in meeting assembled for that purpose and that such lists were then made up in a single list and adopted by the Board of County Commissioners as the jury list for Indian River County for the year 1936. To the list was attached an affidavit in the following language:

"STATE OF FLORIDA, INDIAN RIVER COUNTY.

"Before the undersigned authority on this day personally appeared J. J. P. Hamilton, Chairman; Frank C. Vickers; R. E. Mudge; E. P. Poole and Edwin A. Helseth, who being duly sworn say severally that as members of the Board of County Commissioners in and for said County, they personally selected and made out the foregoing list of names of persons qualified to serve as jurors in said County, and that affiants know or have good reason to believe, that each of the persons whose names appear in said list is a law abiding citizen of approved integrity, good character, sound judgment and intelligence, not physically or mentally infirm, is above the age of 21 years, is a citizen of the State of Florida, has resided in this State for one year and in this County for six months and has not been convicted of bribery, forgery, perjury or larceny, of any felony, and is otherwise qualified under the law to serve as a juror; that the foregoing jury list has been signed and verified by the said Commissioners as having been personally selected as aforesaid, and as possessing the prescribed qualifications according to their best information and belief.

"J. J. P. HAMILTON,     "FRANK C. VICKERS,
"R. E. MUDGE,          "E. P. POOLE,
                      "EDWIN A. HELSETH.

"Subscribed and sworn to before me at Vero Beach, said County and State, this 17th day of February, 1936.

            "MILES WARREN,
            "Clerk Circuit Court,
            "Indian River County, Florida."

The list prepared, as above stated, was certified by the members of the Board of County Commissioners as:

     "JURY LIST, INDIAN RIVER COUNTY, FLORIDA.
               "1936.

"Selected February 17th, 1936, as possessing the qualifications of Jurors as prescribed by the Laws of Florida.

            "J. J. P. HAMILTON,
            "R. E. MUDGE,
            "FRANK C. VICKERS,
            "E. P. POOLE."

Then followed the affidavit above quoted. (Page 3.)

Section 2772 R. G. S., 4444 C. G. L., provides, in part, as follows:

"The county commissioners of the several counties shall hold a meeting in the first week of January each year, or as soon thereafter as practicable, and at such other times as the circuit judge may order and shall select from the list of male persons who are qualified to serve as jurors under the provisions of Section 4443, and personally select and make out a list of not less than two hundred fifty nor more than five hundred persons .properly qualified to serve as jurors, who, in addition to the qualifications above mentioned, shall be such persons only as the said commissioners know, or have good reason to believe, are law abiding citizens of approved integrity, good character, sound judgment and intelligence, and who are not physically or mentally infirm, which list shall be signed and verified by the said com-

missioners as having been personally selected, as aforesaid, and as possessing the prescribed qualifications according to their best information and belief. Said list shall be forthwith delivered to the clerk of the circuit court and by him recorded in the minute book of the Board of County Commissioners."

The remainder of this section is not material here.

We think that the record shows a substantial and fair compliance with the terms of the statute and there was no error committed by the court below in denying the challenge to the array of jurors.

The contention presented by Question Four, stated above, is without merit. It is well settled that the conduct and general demeanor of the accused shortly after the commission of a crime which is not merely self-serving may be shown in evidence because the same is relevant, whether a part of the *res gestae* or not. See 16 C. J. 549, and authorities there cited.

In Prince v. State, 100 Ala. 144, 14 Sou. 409, the Supreme Court of Alabama held:

"A witness testified that, when he entered defendant's house soon after the killing 'defendant was perspiring freely, and seemed much excited.' *Held,* that an objection to the whole of this evidence was too broad, since evidence that defendant was perspiring freely was at least admissible."

Aside from this, however, if error had been committed in the reception of testimony, it became harmless when defendant took the stand as a witness in his own behalf and testified to such a state of facts as clearly showed him guilty of murder in the first degree. See Chesser v. State, 85 Fla. 151, 95 Sou. 610.

The contention presented by the Fifth Question is not

supported by the record. The defendant testified in effect that the jailer and also the State's attorney advised him to confess and held out to him the hope that by doing so he would save his life. This issue was squarely met by the jailer and the State's attorney, both of whom denied that there was any truth in the defendant's statement. They also produced other witnesses who corroborated their testimony in this regard. The trial court was evidently convinced that the defendant's statement was false and that the confession was not procured by coercion or the hope of reward.

So there was no error in allowing the alleged confession to be offered in evidence. Again, however, we may say that if there had been error in admitting the alleged confession, it became harmless when the defendant took the stand and testified as he did. A part of defendant's testimony was as follows:

"I have been back in Indian River County about five months before I got into this trouble. I had been working there for Sam Jones. I had been working for him close around two months. I rode over there that Sunday morning. Nobody made me go. I went over on my own free will. There was some mention about taking some money before I went over there. We were going to steal that money. Norwood and I went over there for the purpose of stealing money. We went to Sam Jones' house. I did not go in the house. The way I got the gun, the gun was standing right at the door. That's the gun I shot Sam Jones with. That's the gun I reached inside the door of Sam Jones' house and got. I couldn't say it was loaded. The gun went off. It must have been loaded, but I didn't look in it. George Norwood and I were going over to Sam Jones' house to steal some money. I didn't know where

Sam Jones would be. I never did know where the money was. I did not know he had money. I reckon George told me he had money. We went over there to steal some money from Sam Jones. I did not go over there to kill him. When I went over there Sam Jones was not there. He was up at Mr. Aken's house. Sam Jones came up and went in the house. I did not stand up there and watch him, I was back there. I saw him when he went in the house, and I saw him when he came out. He came out of the house and went and stood on the bridge a while. That bridge is not on the highway. It is on Mr. Aken's place, where Sam Jones lived. That is not where I shot him.

"Q. Where was he when you shot him?

"A. He stood on the bridge a while and came back, to the back of the house, and came back like he was going to the bridge—

"Q. And that's when you shot him?

"A. When he got along there George demanded me to shoot and I shot.

"Q. You didn't have to shoot him?

"A. I was demanded to shoot, yes, sir. I throwed it up, I didn't take no aim, just threw up the gun and fired, and threw it down and run off.

"Q. Now isn't it a fact that after you shot him you got scared and run?

"A. Got scared when I shot the gun. I throwed it down and told him I wouldn't have anything else to do with it and ran off twenty-five or thirty feet and a pistol fired, that's all, and I went on down by Slim Hopkins' place. I went down as far as Slim's place. I talked to Slim there."

So it is that the record shows by the defendant's own statement that he and George Norwood went to the home of Sam Jones for the purpose of committing robbery or

larceny; that both the defendant and Norwood were armed, defendant with a shotgun and Norwood with a pistol. They approached the house where Jones lived; Jones appeared on the scene and they both deliberately shot him. A physician as an expert witness testified that either shot would have produced death. Under the conditions in which the killing occurred, it was immaterial whether accused actually fired a shot or not. If Norwood alone had done the shooting when he and the defendant were engaged in the enterprise of perpetrating a robbery, they would have both been equally guilty of murder. A charge embodying the propoosition stated in the question would have been erroneous and was properly refused. A man cannot enter into a conspiracy with another to commit a robbery, go upon the scene where the robbery is to be committed, observe the proposed victim at that place and thereupon shoot the proposed victim, inflicting a mortal wound, then throw down his gun and run away while his accomplice stands his ground and delivers another fatal shot and be heard to say that he abandoned his criminal intent after firing one shot and that his accomplice only is guilty of the murder. Therefore, the proposed charge found no basis in the record. See Wilson v. State, 47 Fla. 118, 36 Sou. 580; Settles v. State, 75 Fla. 296, 78 Sou. 287; Milligan v. State, 75 Fla. 815, 78 Sou. 535; Buchanan v. State, 95 Fla. 301, 116 Sou. 275. See also Pope v. State, 84 Fla. 428, 94 Sou. 865.

The judgment should be affirmed and it is so ordered.

Affirmed.

Ellis, C. J., and Terrell, J., concur.

Whitfield, P. J., and Chapman, J., concur in the opinion and judgment.

Brown, J., dissents in part.

398

BROWN, J. (dissenting in part).—The motion of defendant to strike the statement of one of the State's witnesses to the effect that the defendant "didn't look right" should have been granted. It was a mere conclusion of the witness, and does not come up to the rule laid down in Prince v. State, 100 Ala. 144, 14 So. 409. However, I agree that this ruling did not constitute reversible error in this case.

It is held in many jurisdictions that the killing of an innocent man cannot be justified or excused on the ground that it was done under threats and compulsion from a third person or persons in order to save the slayer's life. This feature of this case might be proper for consideration by the Board of Pardons, but it cannot be considered here as a ground for setting aside the verdict and judgment. See 30 C. J. 88-89.