MORRIS DAVIS v. STATE.

187 So. 783.
Opinion Filed April 7, 1939.
Rehearing Denied April 25, 1939.

424

*W. D. Bell,* for Plaintiff in Error;

*George Couper Gibbs,* Attorney General, *Tyrus A. Norwood,* and *Thomas J. Ellis,* for Defendant in Error.

THOMAS, J.—The plaintiff in error was indicted for murder in the first degree and the jury found him guilty of murder in the second degree.

The deceased was the wife of plaintiff in error, and there is evidence in the record that on Christmas night, nineteen thirty-seven, they had quarrelled about the husband's attentions to other women. Upon reaching their home, from the business section of La Belle, where the argument commenced, the wife was mortally wounded by a charge of small shot from the husband's shotgun. There were no eye witnesses to the homicide.

It was the defendant's version that he attempted to commit suicide and in the struggle, which resulted from the deceased's efforts to prevent him, the gun accidentally fired. Upon her deathbed the wife denied that it was an accident. The physician, who reached the scene a short time after the tragedy occurred, gave this significant statement: "I said 'how did the accident happen?' and she said 'it was no accident; Morris shot me.'"

There was much evidence to contradict defendant's story about the defect in the firearm which caused it to fire accidentally upon occasion, and considerable evidence too of conflicting tales told by him about the circumstances of his wife's death. A detailed review of the bill of exceptions will serve no real purpose, but we are convinced from reading it that there was ample evidence to support the charge of murder in the first degree.

In his brief accused has raised the question whether a defendant who has been placed on trial for having killed a person unlawfully and with a premeditated design (murder in the first degree) has notice of a charge that he took human life in an act imminently dangerous to another and evincing a depraved mind regardless of human life (murder in the second degree).

This is easily answered by referring to the statute and the previous decisions of this court. It is incumbent on the jury, when a defendant is found "guilty under an indictment for murder" to "ascertain * * * the degree of unlawful homicide of which he is guilty, but if the defendant on arraignment confesses his guilt, the court shall proceed to determine the degree upon an examination of the testimony." Sec. 7140, C. G. L. 1927.

"Verdict not to be set aside. * * * In all criminal prosecutions hereafter begun in this State, if the defendant be found guilty of an offense lesser in degree, but included within the offense charged in the indictment or information, such verdict shall not be set aside by the court, upon the ground that such verdict is contrary to the evidence, if the evidence produced in such a case would have supported a finding, or if such court would have sustained a verdict of guilty of the greater offense." Sec. 8415, C. G. L. 1927.

The indictment for murder in the first degree charged the lesser degree of unlawful homicide and the defendant's

guilt of each was in question. McCoy v. State, 40 Fla. 494; 24 South. Rep. 485; Morrison v. State, 42 Fla. 149, 28 South. Rep. 97; Lovett v. State, 95 Fla. 269, 116 South. Rep. 7; Jenkins v. State, 100 Fla. 1599, 132 South. Rep. 198.

In view of these acts of the legislature and expressions of this court, there is no doubt that plaintiff in error knew that he was confronted with the charge of murder in the two degrees.

The method of selecting the jury list was brought into question by pleas alleging, among other things, that the names of prospective jurors were hastily selected in the presence of prosecuting officers and were not recorded in the minutes of the county commissioners before the grand jury was drawn.

We have examined the four authorities cited in support of the contention that these pleas should have been held valid but, we do not think they warrant the construction given them by counsel. In Chance v. State, 115 Fla. 379, 155 South. Rep. 663; it was represented that persons other than the county commissioners took part in the selection of the jury list, although this function was one for the personal attention of the commissioners. Here facts are not distinctly averred showing actual participation on the part of the prosecuting attorney. The circumstances for the bases of the rulings in Taylor v. State, 117 Fla. 706, 158 South. Rep. 437; Lake v. State, 100 Fla. 367, 129 South. Rep. 834; and Slayton v. State, 105 Fla. 586, 141 South. Rep. 875, are not analogous to those reflected in defendant's pleas.

In Wiggins v. State, 101 Fla. 404, 134 South. Rep. 236, we quoted with approval the following excerpt from English v. State, 31 Fla. 340, 12 South. Rep. 689.

" 'We must presume that the county commissioners performed their duty in selecting the number of 248 names a.,

a jury list, in the absence of any showing that they abused the discretionary powers conferred upon them by the statute.'" 134 South. Rep. text 236.

We quote from Morey v. State, 72 Fla. 45, 72 South. Rep. 490, with reference to the recordation of the list after the grand jury was chosen:

"Pleas in abatement are required to possess the highest degree of certainty in their averments, and of course all intendments are taken against the pleader. Cannon v. State, 62 Fla. 20, 57 South. 240; Young v. State, 63 Fla. 55, 58 South. 188; Keech v. State, 15 Fla. 591. Section 1574, General Statutes of 1906, same section Florida Compiled Laws of 1914, requires the clerk of the circuit court in the presence of the sheriff, upon receiving the list of jurors, to write the names of the persons contained therein on separate pieces of paper, and fold or roll such pieces of paper so that the names written thereon shall not be visible, and deposit them in the jury box, from which box the names of persons to serve on the grand or petit juries are drawn. If these names were correctly taken from the list and written upon separate pieces of paper and the same folded and deposited in the box as the law required, the defendant could not have been injured in the enjoyment of his rights, if the clerk did *thereafter* incorrectly record the list in the minutes of the county commissioners nor could the defendant have suffered any wrong if the list had been previously recorded. In the case of Keech v. State, *supra,* the court said:

" 'If the clerk neglects to perform such duty as directed by the statute, the court may require and compel him to do it at any time, and thus the omission is cured. The accused cannot be prejudiced by it.' See Cochran v. State, 65 Fla. 91, 61 South. 187." (Italics supplied).

Thus, we believe there was no error in the ruling of the court on the pleas.

The next error complained of is the action of the court in overruling the challenge to the array of jurors. The ground relied on was the list was an aggregate of five separate selections made by the members of the board, hence when completed was not the personal selection of each commissioners.

This is set at rest completely by the opinion in Smith v. State, 129 Fla. 388, 176 South. Rep. 506. We quote from that case:

"The record shows that the County Commissioners from each of the County Commissioner's Districts prepared from the registration books a list of persons qualified to serve as jurors from his respective district; that the list of names prepared by each of the County Commissioners, respectively, was submitted during a meeting of the Board of County Commissioners held for the purpose of preparing the jury list to each of the other members of the Board of County Commissioners; that such lists so prepared were respectively approved by the members of the Board of County Commissioners in meeting assembed for that purpose and that such lists were then made up in a single list and adopted by the Board of County Commissioners as the jury list for Indian River County for the year 1936." 129 Fla. Page 391, 176 So. Page 507.

The court, speaking through Mr. Justice BUFORD, observed:

"We think that the record shows a substantial and fair compliance with the terms of the statute and there was no error committed by the court below in denying the challenge to the array of jurors." 129 Fla. text 394.

The dying declaration of the victim was allowed in evidence over objection of counsel for the accused, and this ruling is also assigned as error.

This evidence was admissible if it was established that the declarant was convinced that death was inevitable and all hope of recovery had been abandoned. The question is one of mixed law and fact for decision by the trial judge, and the presumption is that he was fully satisfied the person making the statement thought at the time that death was imminent. Richardson v. State, 80 Fla. 634, 86 South. Rep. 619; Bennett v. State, 66 Fla. 369, 63 South. Rep. 842; Lester v. State, 37 Fla. 382, 20 South. Rep. 232.

The following questions asked by the attending physician, who reached the scene of the homicide soon after it occurred, and his answers depict the true physical condition of deceased and her realization that death was impending:

"Q. Did she make any statement with reference to whether she was going to live or die?

"A. Yes, sir.

"Q. What was that statement?

"A. She said she was dying.

"Q. Did she make that statement once or more than once?

"A. More than once.

"Q. Then did she make any other statement other than that she said she was going to die?

"A. Yes, sir.

"Q. Then what other statement did she make in your presence?

"A. She mentioned several times she was dying and was suffering.

"Q. How long did she live after she made that statement she was dying?

"A. Probably fifteen minutes.

"Q. Did she make any other statement to you subse-

quent to the statement which you said she made with reference to her dying?

"A. She said she was thirsty and wanted water.

"Q. I will ask you did anybody else get there about that time?

"A. Yes, sir.

"Q. Who came?

"A. Cleary Davis and a young man. I didn't know who he was, but I understood he was Cleary Davis' brother-in-law.

"Q. Did you hear any other statements that she made, or did she make any after he came there that you heard?

"A. Yes, sir.

"Q. What were those statements?

"A. She made a statement in his presence she was dying.

"Q. Did she make any other statements?

"A. Made a statement about her suffering and she was dying and wanted water.

"Q. At the time she made the statements, or previous to the time had you given her any injection of any kind?

"A. I gave her injections, one hyperdermic, and she made a statement before and after I gave her the hyperdermic injection.

"Q. How long did she live after you gave her the hyperdermic injection?

"A. I think about probably seven to eight or nine minutes, ten minutes.

"Q. How long would it take, ordinarily, for the injection you gave her to take effect?

"A. Fifteen or twenty minutes.

"Q. In your opinion had that injection taken effect at the time she died?

"A. No, it had no effect; didn't have time.

"Q. Doctor, did she at any time make any statement in which she held out any hope of recovery.

"A. No, sir, she did not.

"Q. Did she make any statements other than the ones you have related?

"A. Well, ones I related she repeated several times.

"Q. What was that?

"A. That she was dying and she was thirsty and wanted water and that she was dying."

We believe the court was thoroughly correct in his conclusion that the declaration of deceased was made when she thought death inevitable.

Our study of the record in the light of the briefs and the arguments has failed to reveal any reversible error, therefore, the judgment is affirmed.

TERRELL, C. J., and WHITFIELD, BROWN, BUFORD and CHAPMAN, J. J., concur.